Samuel PETER, Sr., individually and as
father and next friend of Samuel
Peter, Jr., Appellant,

v.

SCHUMACHER ENTERPRISES, INC.,
d/b/a Last Frontier Insurance
Cache, Appellee.

Samuel Peter, Sr., individually and as
father and next friend of Samuel
Peter, Jr., Petitioner,

v.

The Progressive Corporation, Progressive
Northwestern Insurance Company,
Schumacher Enterprises, Inc., d/b/a Last
Frontier Insurance Cache, Respondents.

Nos. S–9177, S–9303.

Supreme Court of Alaska.

May 11, 2001.

David Karl Gross, Law Offices of Murphy L. Clark, Anchorage, for Appellant/Petitioner.

L.G. Berry, Robertson, Monagle & Eastaugh, Anchorage, for Appellee/Respondent Schumacher Enterprises, Inc., d/b/a Last Frontier Insurance Cache.

Gary A. Zipkin, Susan M. West, Guess & Rudd, P.C., Anchorage, for Amicus Curiae/Respondents The Progressive Corporation and Progressive Northwestern Insurance Company.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

### OPINION

MATTHEWS, Chief Justice.

Two major legal questions are presented in this case. The first is whether insurance agents have a common-law duty to advise customers about their insurance coverage. We conclude that insurance agents do have a

common-law duty to advise if a "special relationship" exists between the agent and the insured. The second question is whether customers may sue insurers who violate AS 21.89.020(c), which requires insurance companies to offer limits up to $1,000,000 for underinsured motorist coverage. We conclude that such a suit may be maintained, because factors used to decide whether private remedies are implied by a statute favor implication. Because the insurance agent and insurance company were granted summary judgment on the claims against them, and because genuine issues of material fact are presented as to whether a special relationship existed between the insurance agent and the insured, and whether the insurance company offered the statutory limits of underinsured motorist insurance, resolution of these questions requires remand of the case.

## FACTS AND PROCEEDINGS

On March 27, 1995, Donita Peter dropped off her eight-year-old son Samuel on the street opposite from his school bus stop. As he crossed the street he was struck by a car driven by Cynthia Pack. Samuel was brain-damaged in the accident.

Pack had liability coverage, but her policy limits were much less than Samuel's expected damages. Samuel's parents, Donita and Samuel, Sr. (Peter), also were insured. They were covered by a policy issued by respondent Progressive Northwestern Insurance Company with limits of $50,000 per person and $100,000 per accident ($^{50}\!/_{100}$) for uninsured and underinsured motorist (UM/UIM) coverage.

The facts surrounding the acquisition of the Progressive policy by the Peters are important to a number of the issues in this case. The policy was purchased by Donita Peter in August of 1994 from Last Frontier Insurance Cache, an agency with which the Peters had done business for ten years. What was done and said during the transaction in which this policy was purchased is disputed. Donita Peter claims that she initially telephoned asking for "full coverage," and that in the office she was not told that she could purchase UM/UIM coverage with limits higher than 50/100. Peter describes the transaction as follows in his brief:

At the time this policy was purchased, Last Frontier did not discuss what specific insurance needs Donita Peter may require. Last Frontier did not inquire into whether the minimum insurance required by law would be adequate to protect her and her family. Last Frontier did not consider financial status, family needs, value of assets, and the importance of underinsured motorists coverage when the policy was sold. In essence, the policy was sold without determining whether it adequately protected the Peters, or not.

By contrast, Karen Boone, the Last Frontier employee with whom Donita Peter dealt, asserts that various policy limits were discussed and that she gave Donita a "policy pack" which contained a copy of the policy and a description of the levels of available UM/UIM coverage. The record is undisputed that Donita signed a form which states as follows:

I understand that I am entitled to purchase Uninsured/Underinsured Motorists Coverage. I may choose to reject UM/UIM BI/PD or UM/UIM PD. I specifically and unequivocally select the following option of Uninsured/Underinsured Motorists Protection:

I selected UM/UIM/BI limits of: 50/100

I selected UM/UIM/PD limits of: 25

Although the form refers to "the following option," implying that there are other options, no other options are listed on the form. Donita Peter claims that if she had known that she could have purchased higher limit coverage she would have done so.

Peter sued Progressive and Last Frontier. Peter alleged that Progressive had a duty to offer higher limit UM/UIM coverage and that Last Frontier had a duty to recommend that they purchase higher limit coverage and that both defendants breached their respective duties.

Both defendants answered, and after much discovery Last Frontier moved for summary judgment. Last Frontier contended (1) that it had no duty to recommend higher coverage to the Peters, (2) alternatively, that it did not breach this duty, and (3) alternatively, that

any breach it may have committed caused the Peters no loss.

Peter opposed the motion and filed a cross-motion for summary judgment. He argued that Last Frontier violated AS 21.89.020(c) by failing to offer the Peters optional higher limit coverage and violated AS 21.89.020(e) by failing to obtain a waiver in writing of optional higher limit coverage: "Last Frontier did not give Donita written notice of the availability of her option to purchase additional liability and underinsured motorist coverage limits as required by AS 21.29.020(c), nor did Donita sign a waiver of the additional coverages as required by subsection (e)." Peter also contended that Last Frontier had a nonstatutory duty to recommend that the Peters purchase higher limits.

The superior court granted Last Frontier's motion, ruling that (1) Last Frontier had no nonstatutory duty to recommend higher limits, (2) no private cause of action may be maintained for violations of AS 21.89.020(c) and (e), and (3) "insurance agents are not independently liable for violations of Title 21 . . . ." The court entered a certificate pursuant to Civil Rule 54(b), and the summary judgment in favor of Last Frontier became final and appealable. Peter appealed.

Meanwhile, Peter and Progressive filed cross-motions for summary judgment in the superior court concerning Progressive's liability for violating AS 21.89.020(c) and (e). The court denied Peter's motion and granted Progressive's, ruling again that (1) no private cause of action is available for violating these sections, and (2) these sections require "only a written waiver of UM/UIM bodily injury and property damage coverages," not "that the various optional limits be rejected in writing." We granted Peter's petition for review from this order and consolidated the two proceedings in this court.

### STATUTORY SECTIONS

Alaska Statute 21.89.020(c) requires insurance companies to offer in automobile liability policies UM/UIM coverage with minimum limits of $50,000 per person and $100,000 per accident. In addition, subsection (c)(2) requires that optional higher limits be offered up to $1,000,000/$2,000,000. Subsection (d) requires insurance companies to offer minimum limits of $25,000 for UM/UIM property damage coverage. Subsection (e) provides that "[t]he coverage required under (c) and (d) . . . may be waived in writing by the insured in whole or in part." These subsections are set forth in the margin.[1]

1. AS 21.89.020 provides in relevant part:

(c) An insurance company offering automobile liability insurance in this state for bodily injury or death shall, initially and at each renewal, offer coverage prescribed in AS 28.20.440 and 28.20.445 or AS 28.22 for the protection of the persons insured under the policy who are legally entitled to recover damages for bodily injury or death from owners or operators of uninsured or underinsured motor vehicles. The limit written may not be less than the limit in AS 28.20.440 or AS 28.22.101. Coverage required to be offered under this section must include the following options:

(1) policy limits equal to the limits voluntarily purchased to cover the liability of the person insured for bodily injury or death;

(2) except when the coverage consists of motorcycle liability insurance, and except for a named insured required to file proof of financial responsibility under AS 28.20 or an applicant required to file proof of financial responsibility under AS 28.20, policy limits in the following amounts when these limits are greater than those offered under (1) of this subsection:

(A) $100,000 because of bodily injury to or death of one person in one accident, and, sub-

ject to the same limit for one person, $300,000 because of bodily injury to or death of two or more persons in one accident;

(B) $300,000 because of bodily injury to or death of one person in one accident, and, subject to the same limit for one person, $500,000 because of bodily injury to or death of two or more persons in one accident;

(C) $500,000 because of bodily injury to or death of one person in one accident, and, subject to the same limit for one person, $500,000 because of bodily injury to or death of two or more persons in one accident;

(D) $500,000 because of bodily injury to or death of one person in one accident, and, subject to the same limit for one person, $1,000,000 because of bodily injury to or death of two or more persons in one accident;

(E) $1,000,000 because of bodily injury to or death of one person in one accident, and, subject to the same limit for one person, $2,000,000 because of bodily injury to or death of two or more persons in one accident;

(3) other policy limits at the option of the insurer.

(d) An insurance company offering automobile liability insurance in this state for injury to or destruction of property shall offer coverage

*SUMMARY OF ISSUES AND OUR DECISIONS CONCERNING THEM*

The briefs in these cases present numerous issues. We summarize them here, along with our decision concerning each issue.

1. Did Last Frontier have a common-law duty to advise the Peters as to whether their coverage limits were appropriate?

DECISION: If a "special relationship" existed between Last Frontier and the Peters there was such a duty. There are genuine issues of material fact as to whether there was such a relationship.

2. Do AS 21.89.020(c) and (e) give rise to duties that are enforceable in a private action against an insurance company?

DECISION: Yes.

3. Do the same subsections give rise to duties that are enforceable in a private action against an insurance agent?

DECISION: No.

4. Were there genuine issues of material fact as to the claim that Progressive violated its duty under AS 21.89.020(c) to offer optional limits?

DECISION: Yes.

5. Does AS 21.89.020(e) require the written waiver of each set of optional limits that is not selected?

DECISION: No.

6. Did the court err in refusing to continue the determination of Last Frontier's motion for summary judgment in order to permit Peter to conduct further discovery?

DECISION: No.

We now discuss these points.

1. *Determining Whether Last Frontier Had a Common-law Duty to Advise Depends upon the Resolution of Contested Issues of Material Fact.*

■ Last Frontier argues that the rule in most jurisdictions is that insurance agents have no duty to recommend higher limits for liability or UM/UIM coverage in the absence of special circumstances.[2] Peter argues that Alaska cases establish that agents generally have a duty to advise their clients of appropriate coverage and that this includes a duty to advise of appropriate liability and UM/UIM limits.[3] Although we agree with Last Frontier that insurance agents have no duty to advise in the absence of special circumstances, we conclude that Donita Peter's affidavit raises genuine issues of material fact as to whether special circumstances existed.

■ This court has previously held that an insurance agent owes a duty to the insured to exercise reasonable care, skill, and diligence in procuring insurance.[4] Insurance agents have a well-established common-law duty "to obtain requested coverage for their clients within a reasonable time or inform the

prescribed in AS 28.20.440 and 28.20.445, or AS 28.22, with limits not less than those prescribed in AS 28.20.440 or AS 28.22.101, to cover the insured person's liability for injury to or destruction of property, for the protection of the persons insured under the policy who are legally entitled to recover damages for injury to or destruction of the covered motor vehicle from owners or operators of uninsured or underinsured motor vehicles.

(e) The coverage required under (c) and (d) of this section may be waived in writing by the insured in whole or in part. After selection of the limits by the insured or the exercise of the option to waive the coverage in whole or in part, the insurer is not required to notify any policy holder in any renewal, supplemental, or replacement policy, as to the availability of the coverage or optional limits, and the waived coverage may not be included in any renewal, supplemental, or replacement policy. The insured may, at any time, make a written request

for additional coverage or coverage more extensive than that provided on a prior policy.

2. *See, e.g., Murphy v. Kuhn,* 90 N.Y.2d 266, 660 N.Y.S.2d 371, 682 N.E.2d 972 (1997); *Nelson v. Davidson,* 155 Wis.2d 674, 456 N.W.2d 343 (1990); *see also Farmers Ins. Co. v. McCarthy,* 871 S.W.2d 82 (Mo.App.1994).

3. Peter cites such Alaska cases as *Johnson & Higgins of Alaska, Inc. v. Blomfield,* 907 P.2d 1371 (Alaska 1995); *Tripp, Inc. v. Kenneth A. Murray Ins., Inc.,* 600 P.2d 1361 (Alaska 1979); *Eagle Air, Inc. v. Corroon & Black/Dawson & Co.,* 648 P.2d 1000 (Alaska 1982); *Austin v. Fulton Ins. Co.,* 444 P.2d 536 (Alaska 1968); *Continental Ins. Co. v. Bayless & Roberts, Inc.,* 608 P.2d 281 (Alaska 1980); and *Gudenau & Co. v. Sweeney Ins., Inc.,* 736 P.2d 763 (Alaska 1987).

4. *See Eagle Air,* 648 P.2d at 1006.

client of the inability to do so." [5] Because the prospective insured typically knows the extent of her personal assets and her ability to pay better than the insurance agent, however, it is generally the responsibility of the insured to advise the agent of the insurance that she actually wants, including policy limits.[6] Ordinarily, then, an insurance agent fulfills her duty to the insured by providing requested coverage, and has no duty to advise a client to obtain different or additional coverage.[7]

The Court of Appeals of New York recently summarized some of the policy reasons underlying the rule that insurance agents have no duty to advise customers to obtain additional coverage:

> Insurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status.... Insureds are in a better position to know their personal assets and abilities to protect themselves more so than general insurance agents or brokers, unless the latter are informed and asked to advise and act.... Furthermore, permitting insureds to add such parties to the liability chain might well open flood gates to even more complicated and undesirable litigation.[8]

An additional but related reason is that imposing a duty to advise "could afford insureds the opportunity to insure after the loss by merely asserting they would have bought the additional coverage had it been offered." [9] This would amount to retroactive insurance, a concept "that turns the entire theory of insurance on its ear." [10]

Still another reason pertaining to liability and bodily injury insurance is that the question of adequacy of coverage is necessarily a matter of opinion. "Neither an insurance agent nor anyone else has the ability to accurately forecast the upper limit of any damage award in a negligence action against the insured by a third party".[11] The absence of any "correct" answer as to what insurance limits are appropriate is especially true with respect to UM/UIM coverage. As with all insurance, the amount of UM/UIM coverage is a trade off between cost and risk, but risk is in part subjective and dependent on other available resources that may mitigate the consequences of personal injury, such as medical and disability insurance.

Finally, an undesirable consequence of imposing such a duty would be that agents would defensively tend to advise their customers to buy the highest, most comprehensive and expensive coverages rather than more modest packages that most people of similar means would find suitable. This could result in a mis-allocation of personal resources of individual insureds.

Despite the strong arguments in its favor, however, exceptions to the general no-duty rule may arise if a "special relationship" exists between the insured and the insurance agent. If the insurance agent misrepresents the nature of the coverage being offered or provided, for example, the insured may justifiably rely on the agent's representations in choosing the policy.[12] In addition, an insurance agent may voluntarily assume the re-

---

**5.** *Murphy*, 660 N.Y.S.2d 371, 682 N.E.2d at 974.

**6.** *See Jones v. Grewe*, 189 Cal.App.3d 950, 234 Cal.Rptr. 717, 721 (1987); *Suter v. Virgil R. Lee & Son, Inc.*, 51 Wash.App. 524, 754 P.2d 155, 157 (1988).

**7.** *See, e.g., Fitzpatrick v. Hayes*, 57 Cal.App.4th 916, 67 Cal.Rptr.2d 445, 452 (1997); *Harts v. Farmers Ins. Exchange*, 461 Mich. 1, 597 N.W.2d 47, 51–52 (1999); *Nelson v. Davidson*, 155 Wis.2d 674, 456 N.W.2d 343, 347 (1990). *See also, e.g., Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 248 (Ky.1992); *Gabrielson v. Warnemunde*, 443 N.W.2d 540, 543–44 (Minn. 1989); *Trotter v. State Farm Mut. Auto. Ins. Co.*, 297 S.C. 465, 377 S.E.2d 343, 346 (App.1988); *Suter v. Virgil R. Lee & Son, Inc.*, 51 Wash.App. 524, 754 P.2d 155, 157 (1988).

**8.** *Murphy*, 660 N.Y.S.2d 371, 682 N.E.2d at 976.

**9.** *Nelson*, 456 N.W.2d at 346.

**10.** *Farmers Ins. Co.*, 871 S.W.2d at 86.

**11.** *Jones*, 234 Cal.Rptr. at 721.

**12.** *See, e.g., Fitzpatrick*, 67 Cal.Rptr.2d at 452 (holding that general "no duty" rule will not apply if, inter alia, the agent misrepresents the nature, extent, or scope of the coverage being offered or provided); *Harts*, 597 N.W.2d at 50–51 (holding that general "no duty" rule will not apply if, inter alia, the agent misrepresents the nature or extent of the coverage offered or provided).

sponsibility for selecting the appropriate insurance policy for the insured.[13] Moreover, because an insurance agent does have a·duty to provide (or attempt to provide) requested coverage, the agent may be liable to the insured if the agent fails to respond appropriately to a request or inquiry for or about a particular type or extent of coverage.[14] Finally, an insurance agent may have a duty to clarify an ambiguous request before providing coverage.[15]

■■■ As the trial court granted summary judgment in favor of Last Frontier, we are required to credit that view of the facts most favorable to Peter. Donita alleges that she requested "full coverage," was handed a policy without being informed that she had the ability to choose different levels of coverage, and was in fact unaware that she could choose different levels of coverage. Standing alone, a request for "full coverage" is not a request for a specific type of coverage.[16] Karen Boone, who sold Donita her policy, affies that she was not surprised by Donita's "choice[ ]" of $^{50}\!/_{100}$ coverage, the statutory minimum, as Donita had also chosen minimum coverage for her most recent insurance policy, which had ultimately been canceled for non-payment. But we decline to hold, as a matter of law, that a prior choice of the statutory minimum levels of coverage, combined with a history of payment difficulties, removes all ambiguity from a request for "full coverage." Boone's decision to offer only a single level of UM/UIM coverage thus cannot be viewed as simply "responsive" to

Donita's request for "full coverage."[17] Instead, by failing to inform Donita that she had other options for UM/UIM coverage, Boone either implicitly recommended $^{50}\!/_{100}$ coverage by offering only that option[18] or, at a minimum, failed to clarify Donita's ambiguous request for "full coverage."[19]

■■■ Of course, the facts that underlie the transaction between Donita and Last Frontier are disputed, and Boone affies that she did inform Donita that she could choose higher levels of UM/UIM coverage. What actually occurred is a question of fact for resolution at trial. If the facts are resolved favorably to the Peters, however, then the "special relationship" exception to the no-duty rule will have been established. If this exception is established then, by definition, Last Frontier had a duty to advise Donita as to appropriate levels of coverage. We believe that subsumed within this duty would be a duty to advise of available levels of coverage. Given the personal and subjective nature of UIM coverage and the doubts that we have expressed as to whether there is such a thing as an "appropriate" level for UIM coverage, advice as to available limits may be more useful than advice as to appropriate limits. While the latter may be almost entirely a matter of personal choice, it is important to have information on available limits so that the choice ultimately made by the insured is an informed one.

Under the particular facts of this case, in order to determine whether a special rela-

---

13. *See, e.g., Harts,* 597 N.W.2d at 52 (holding that general "no duty" rule will not apply if, inter alia, (1) an inquiry is made that may require advice and the agent, though he need not, gives advice that is inaccurate, or (2) the agent assumes an additional duty by either express agreement or promise to the insured).

14. *See, e.g., Fitzpatrick,* 67 Cal.Rptr.2d at 452 (holding that general "no duty" rule will not apply if, inter alia, there is a request or inquiry for a particular type or extent of coverage).

15. *See Harts,* 597 N.W.2d at 52 (holding that general "no duty" rule will not apply if, inter alia, an ambiguous request is made that requires clarification).

16. *See id.* at 52 n. 11 ("An example of an ambiguous request for coverage that might in certain circumstances require clarification is the request

for 'full coverage.' "); *Small v. King,* 915 P.2d 1192, 1194 (Wyo.1996) (holding that request for "full coverage" is not a specific inquiry about a specific type of coverage).

17. *Cf. Murphy,* 660 N.Y.S.2d 371, 682 N.E.2d at 974 (recognizing that insurance agent has well-established common-law duty to provide, or attempt to provide, *requested* level of coverage).

18. *See Harts,* 597 N.W.2d at 52 (holding that special relationship can be created if agent gratuitously chooses to offer advice).

19. *See id.* (holding that special relationship can be created if agent fails to clarify an ambiguous request).

tionship creating a duty to advise existed, the question of whether Last Frontier informed Donita of optional available levels of coverage must be resolved. If a special relationship is found to exist, the trier of fact must address whether Last Frontier's advice, whether implicit or explicit, was reasonable, or whether Last Frontier should instead have recommended higher levels of UM/UIM insurance.[20] Questions of whether any breach of duty caused harm and, if so, the extent of harm would also remain for resolution. A remand is necessary so that these issues can be resolved.

### 2. AS 21.89.020(c) and (e) Give Rise to Enforceable Duties Against Insurance Companies.

■ Alaska Statute 21.89.020 does not provide that an insured or other person may bring a private action to enforce its provisions. Indeed, there is no enforcement language in section .020. But there is a general enforcement provision applicable to Title 21 of the Alaska Statutes which provides that for any violation of Title 21 a civil penalty of not more than $2500 may be imposed by the state after an administrative hearing.[21]

Although the statute is silent on the question of private enforcement, private actions to enforce the requirements of section .020 have been maintained and approved by this court. In *State Farm Mutual Automobile Insurance Co. v. Harrington* this court ruled that an insured could enforce in a private action the minimum limits mandate of AS 21.89.020(c) as well as the nonwaiver requirement of AS 21.89.020(e).[22] We ruled similarly concerning AS 21.89.020(c) and the requirements for mandatory UM/UIM coverage in Title 28 in *Burton v. State Farm Fire*

*and Casualty Co.*[23] But in these cases the defense that AS 21.89.020 was not privately enforceable was not raised.

By contrast, in *O.K. Lumber Co. v. Providence Washington Insurance Co.* we held that a third-party claimant does not have a private claim against an insurance company under the Unfair Claims Settlement Practices Act, AS 21.36.125.[24] In so holding we noted that the act prohibited repeated practices, not a single incident of misconduct, and therefore "does not readily lend itself to enforcement by a private cause of action arising from a single claim."[25] We also observed that the act contained an elaborate enforcement system, "giving rise to an implication of exclusivity."[26] Further, we stated that the act prohibited many different types of conduct, some of which were relatively minor, and that the standards concerning whether or not violations were committed were often imprecise.[27] Balanced against these characteristics were the relatively modest monetary sanctions imposed for statutory violations.[28] In consideration of all of these factors we concluded that an implied private right of action in favor of a third-party claimant would be inappropriate with respect to the Unfair Claims Settlement Practices Act.[29]

Section 874A of the Restatement (Second) of Torts (1979) discusses a number of factors that are helpful in determining whether or not a private cause of action should be implied based on a statute. We have followed section 874A in a number of cases.[30] Although our *O.K. Lumber* opinion does not cite section 874A, most of the reasons which we give for not implying a cause of action based on the statute there are reasons that are similar to the factors listed

---

20. *See Eagle Air,* 648 P.2d at 1006 (holding that insurance agent owes insured duty of reasonable care).

21. *See* AS 21.90.020.

22. 918 P.2d 1022, 1025–26 (Alaska 1996).

23. 796 P.2d 1361, 1363 (Alaska 1990).

24. 759 P.2d 523, 526–27 (Alaska 1988).

25. *Id.* at 527.

26. *Id.*

27. *See id.*

28. *See id.*

29. *See id.*

30. *See Alaska Marine Pilots v. Hendsch,* 950 P.2d 98, 104–05 (Alaska 1997); *Thoma v. Hickel,* 947 P.2d 816, 822–23 (Alaska 1997); *Plancich v. State,* 693 P.2d 855, 859 n. 9 (Alaska 1985).

in this section of the Restatement.[31] But when these factors are applied to AS 21.89.020, they indicate that a private cause of action should be allowed.

■ Section 874A lists six factors: (1) The nature of the legislative provision—is it clear and specific or broad and general? (2) The adequacy of existing remedies—are they sufficient to accomplish the policy of the provision or do they require supplementation? (3) Will allowing an implied tort action based on the statutory provision interfere with statutory remedies or supplement existing means of enforcement? (4) The significance of the purpose of the legislative provision. (5) The extent of the change in tort law that permitting an implied cause of action would bring about. (6) The burden the new implied tort cause of action will place on judicial machinery. We will briefly discuss these factors as they apply to AS 21.89.020(c) and (e).

As to the first factor, the offer requirement of subsection .020(c) and the waiver-in-writing requirement of subsection .020(e) are both clear and specific, easily lending themselves to usage in a private tort action. And, unlike the Unfair Claims Settlement Practices Act involved in *O.K. Lumber,* a single act of violating either subsection .020(c) or (e) is a violation of the statute.

Concerning the second and third factors relating to the adequacy of existing remedies and the effect that a private tort action would have on existing remedies, the statutory remedy for violations of Title 21 is expressed in AS 21.90.020. It is a civil penalty of not more than $2500 assessed by the state in administrative proceedings before the Division of Insurance. This is the sole statutory remedy applicable to subsections .020(c) and (e). Again this contrasts with the multiple remedies described in *O.K. Lumber* with respect to the Unfair Claims Settlement Practices Act.[32] The $2500 penalty is relatively modest, and the enforcement resources of

the Division of Insurance are necessarily limited. Without a tort remedy it seems likely that many violations of the requirements of subsections (c) and (e) would go unredressed. Further, it is difficult to see how providing an implied tort remedy could interfere with state enforcement. The tort action should provide a meaningful incentive to insurance companies to comply with the statutory requirements.

Concerning the significance factor, it seems sufficient to observe that compliance with subsections .020(c) and (e) is not a minor matter. The legislature has concerned itself since 1984 with making UM/UIM coverages available to the public.[33] And more generally, the objective of adequate compensation for those who are injured in motor vehicle accidents by the fault of another has been recognized since statehood.[34] The legislature stated in the preamble to the Motor Vehicle Safety Responsibility Act as follows:

> The legislature is concerned over the rising toll of motor vehicle accidents and the suffering and loss inflicted by them. The legislature determines that it is a matter of grave concern that motorists be financially responsible for their negligent acts so that innocent victims of motor vehicle accidents may be recompensed for the injury and financial loss inflicted upon them.[35]

As indicated above, permitting a private tort remedy for violations of subsection (c) and (e) will advance the achievement of this objective.

With respect to the extent of the change in tort law, permitting a private action based on subsections (c) and (e) will not make a drastic change. As the *Harrington*[36] and *Burton*[37] cases demonstrate, private actions based on statutory violations of section .020 have been maintained for at least a decade without the present objection being raised. Likewise,

**31.** *Compare O.K. Lumber,* 759 P.2d at 526–27 *with* Restatement (Second) of Torts § 874A.

**32.** *O.K. Lumber,* 759 P.2d at 527.

**33.** *See* ch. 70, § 12, SLA 1984; *Progressive Ins. Co. v. Simmons,* 953 P.2d 510, 514 (Alaska 1998).

**34.** *See* AS 28.20.010.

**35.** *Id.*

**36.** 918 P.2d at 1025–26.

**37.** 796 P.2d at 1363.

concerning the sixth factor, burden on the courts, the statutory requirements of those sections are specific and not difficult to apply. We anticipate that no significant increase in litigation will be brought about by permitting private actions based on these sections.

Based on the foregoing, we conclude that private tort actions may be brought based on violations of AS 21.89.020(c) and (e).

3. *AS 21.89.020(c) and (e) Do Not Give Rise to Enforceable Duties Against Insurance Agents.*

▆▆▆▆ Last Frontier points out that, by their own terms, AS 21.89.020(c) and (e) only mandate conduct by insurance companies, not by insurance agents. Last Frontier therefore argues that it cannot be liable for an implied tort based on a statute that does not govern its conduct.

Peter counters that Last Frontier had an agency agreement with Progressive requiring Last Frontier to comply with all applicable laws relating to the sale of insurance in Alaska. As such, Peter argues that Last Frontier was responsible by contract with Progressive for compliance with the statutory requirements contained in subsections .020(c) and (e). Second, Peter contends that as a policy matter insurance agents should be liable for failing to comply with subsections .020(c) and (e) because it is generally agents rather than insurance companies who directly communicate with the insurance-buying public.

▆▆▆▆ In response to Peter's first point, the contract between Progressive and Last Frontier does not delegate to Last Frontier an obligation to satisfy Progressive's duties under the Alaska Statutes. Further, even if Last Frontier breached its contractual duties to *Progressive* by violating the requirements of subsections .020(c) and (e), Last Frontier would not be liable to the *Peters* on that ground alone. "An agent who ... fails to perform duties to his principal is not thereby liable to a person whose economic interests are thereby harmed."[38]

In response to Peter's policy argument, it is true that sometimes a statute may form the basis for a common-law remedy which extends beyond the scope of the statute.[39] We do not believe that this is an appropriate case for such a remedy. The legislative objective of ensuring that high limit coverage is made available to all Alaskans can likely be achieved with reasonable comprehensiveness even if the duty to offer such coverage is restricted to insurance companies. The legislature could well have believed that there was no reason to impose a redundant duty on insurance agents.

We note also that although other states have similar statutes explicitly requiring insurers to offer uninsured and underinsured motorist coverage, courts in those states have declined to imply a cause of action against insurance agents for violations of those statutes.[40]

---

**38.** Restatement (Second) of Agency § 357 (1958).

**39.** *See Hanebuth v. Bell Helicopter Int'l*, 694 P.2d 143, 146 (Alaska 1984). In explaining this proposition in *Hanebuth* we quoted the following language from the Supreme Court of the United States in *Moragne v. States Marine Lines*, 398 U.S. 375, 392, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970):

> It has always been the duty of the common law court to perceive the impact of major legislative innovations and to interweave the new legislative policies with the inherited body of common law principles-many of them deriving from earlier legislative exertions.
> The legislature does not, of course, merely enact general policies. By the terms of a statute, it also indicates its conception of the sphere within which the policy is to have effect. In many cases the scope of a statute may

reflect nothing more than the dimensions of the particular problem that came to the attention of the legislature, inviting the conclusion that the legislative policy is equally applicable to other situations in which the mischief is identical.... On the other hand, the legislature may, in order to promote other, conflicting interests, prescribe with particularity the compass of the legislative aim, erecting a strong inference that territories beyond the boundaries so drawn are not to feel the impact of the new legislative dispensation.

694 P.2d at 149.

**40.** *See, e.g., Macabio v. TIG Ins. Co.*, 87 Hawai'i 307, 955 P.2d 100, 111–12 (1998); *Robinson v. Charles A. Flynn Ins. Agency*, 39 Mass.App.Ct. 902, 653 N.E.2d 207, 208 (1995).

For these reasons, we conclude that AS 21.89.020(c) and (e) do not give rise to an implied cause of action against insurance agents in cases where their principals did not comply with the requirements of those subsections, nor should they serve as the basis for imposing a common-law duty on insurance agents.

4. *There Are Genuine Issues of Material Fact as to Whether Progressive Violated Its Duty Under AS 21.89.020(c) to Offer Optional Limits.*

 Last Frontier and Progressive take issue with Donita's assertion that the Peters would have purchased higher limits if she had known that higher limits were available. They point out that in policies that the Peters purchased in 1993 and again in 1997 the Peters selected minimum coverage, even though they clearly were advised as to the availability of higher limit coverage as to those policies. Last Frontier and Progressive also argue that the Peters have had trouble making payments on their insurance policies, pointing out that the policy in question and the prior two policies owned by the Peters were canceled for nonpayment. They assert that this cancellation history is evidence that the Peters would not have selected higher limits because the premiums for a higher limit policy would have been greater and such a policy would be even more difficult for the Peters to maintain. Responding in part to these arguments, Peter noted that they had a policy with limits of $^{100}\!/\!_{300}$ from 1990 to 1993.

Alaska Statute 21.89.020(c) clearly requires that policy purchasers be offered the sets of optional limits described in subsection .020(c)(2). But Peter contends that such offers must be made in writing. Finding no textual basis for this argument, we reject it. But there is an unresolved factual question as to whether the availability of the optional limits prescribed by subsection .020(c) was communicated in any form to Donita.

Last Frontier argues that this question is mooted because Donita's assertion that the Peters would have purchased higher limits had they known they were available is insufficient to create a genuine issue of material fact on that point. It bases this argument on the fact that both before and after buying the policy in question the Peters purchased minimal limit policies in circumstances in which they were fully advised of the available options. In support, Last Frontier cites *Sykes v. Melba Creek Mining, Inc.*, where we stated that "there is little probative value to be found in self-serving testimony by parties concerning their subjective intent upon entering into a contract."[41] Last Frontier also refers to *Martech Construction Co. v. Ogden Environmental Services, Inc.*, where we noted that a "naked assertion" by a litigant of an agreement to pay for certain equipment which is supported by no references to corroborating evidence was insufficient to create a genuine issue of material fact.[42] Last Frontier also relies on *Yurioff v. American Honda Motor Co.*, where we observed that to create a genuine issue of material fact there must be more than a "scintilla" of contrary evidence.[43]

Although Donita's affidavit is in her interest and thus can be described as self-serving, we do not believe that it is insufficient to create a genuine issue of material fact. What Donita would have done had higher limits been offered is a speculative subject. But it is a subject on which personal and self-interested testimony is both admissible and necessary to show a loss. Further, although Donita's assertion of what she would have done respecting the 1994 policy is in conflict with what she did with respect to the 1993 and 1997 policies, it is nonetheless consistent with the policy the Peters owned from 1990 to 1993. Finally, we do not regard the evidence that conflicts with her assertion to be so compelling as to render her affidavit merely a "scintilla" of evidence.

For these reasons we conclude that there is also a genuine issue of material fact as to whether the Peters would have purchased higher limits if they had been offered.

---

**41.** 952 P.2d 1164, 1170 n. 12 (Alaska 1998).

**42.** 852 P.2d 1146, 1149–50 n. 7 (Alaska 1993).

**43.** 803 P.2d 386, 389 (Alaska 1990).

##### 5. *Alaska Statute 21.89.020(e) Does Not Require the Written Waiver of Optional Limits Not Selected.*

The superior court ruled that section .020 requires only a written waiver of UM/UIM bodily injury and property damage coverages and does not require that each set of optional limits described in subsection .020(c) be rejected in writing. Peter argues that this interpretation is erroneous.

The text of subsection (e) makes a distinction between "coverage required" and "optional limits." "Coverage required" must be waived in writing, but "optional limits" in the second sentence of (e) is a subject separate from required coverage. The "coverage required" by subsections (c) and (d) is UM/UIM for bodily injury and UM/UIM for property damage. This coverage must be purchased unless the buyer waives it in writing. If the coverage is not waived in writing, it must be for the minimum limits prescribed in subsection .020(c) and (d). The higher limits that must be offered under subsection .020(c)(2)(A)-(E) need not be accepted. They are thus optional rather than required.

That subsection .020(e) refers to waiver "in whole or in part" does not cast doubt on the superior court's ruling. The "in part" language recognizes that some purchasers may wish to buy UM/UIM bodily injury coverage but not property damage coverage. For purchasers whose vehicles are already covered by collision insurance, UM/UIM property damage coverage may be duplicative. The forms in the record indicate that buyers may select UM/UIM bodily injury coverage while rejecting UM/UIM property damage coverage.

That the "in part" language of subsection .020(e) does not refer to a written waiver of the optional limits that must be offered in subsection .020(c) is also plain for another reason. Subsections (c) and (e) were added

to the statute in 1984.[44] As originally enacted subsection (c) contained only the mandatory minimum requirements expressed in the present subsections (c) and (c)(1). The optional limits contained in subsection (c)(2) were not added to the statute until 1990. But subsection (e) has been unchanged since 1984. Thus the "in part" references in subsection (e) were not intended to refer to the optional limits in (c)(2) because the latter did not exist when (e) was written.

##### 6. *The Superior Court Did Not Err in Refusing to Grant a Continuance for Additional Discovery.*

Peter argues that the superior court should have permitted additional discovery under Civil Rule 56(f).[45] Although Peter indicated in his briefing to the superior court that additional discovery was necessary, he did not file an affidavit as required by Rule 56(f) showing why he could not currently present facts essential to his opposition.[46] Further, as we are reversing as to Peter's fact-dependent claims and remanding for further proceedings, any possible error is mooted because there will be an opportunity for further discovery on remand. For these reasons, we conclude that Peter has not demonstrated that he is entitled to any relief based on his argument that he needed a continuance to do more discovery.

#### CONCLUSION

The superior court's summary judgment in favor of Last Frontier is AFFIRMED as to Peter's claim that Last Frontier failed to offer higher limits of coverage as required by AS 21.89.020(c), but REVERSED as to Peter's claim based on a common-law duty to advise. The superior court's grant of summary judgment in favor of Last Frontier and Progressive is AFFIRMED with respect to Peter's claim based on an alleged violation of AS 21.89.020(e). The superior court's grant of summary judgment in favor of Progressive

44. *See* ch. 70, § 3, SLA 1984.

45. Alaska Civil Rule 56(f) provides:

 Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

46. *See Munn v. Bristol Bay Hous. Auth.,* 777 P.2d 188, 193 (Alaska 1989) (requiring such an affidavit).

is REVERSED with respect to Peter's claim that Progressive failed to offer higher limits of coverage as required by AS 21.89.020(c). This case is REMANDED for further proceedings.