776 A.2d 25

Evelyn E. SADLER,

v.

The LOOMIS COMPANY.

No. 1356, Sept. Term, 2000.

Court of Special Appeals of Maryland.

July 5, 2001.

Allen W. Cohen (Cohen & Greene, P.A., on the brief), Annapolis, for appellant.

Robert J. Carson (Robert J. Carson, P.A., Thomas F. Corcoran and Baxter, Sidle, Conn & Jones, P.A., on the brief), Baltimore, for appellee.

Argued before HOLLANDER, SALMON and WILLIAM W. WENNER (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This unfortunate case has its genesis in a tragic automobile accident that occurred on May 13, 1996, involving appellant Evelyn Sadler, an elderly driver, and Timothy Prophet, a motorcyclist. As a result of injuries sustained in the accident, Prophet's leg was amputated. At the time of the accident, Sadler had an automobile liability insurance policy that provided maximum coverage of $100,000. The policy was procured by The Loomis Company ("Loomis"), appellee, an insurance agency that had procured insurance for appellant for several years. When Prophet filed a $10,000,000 negligence suit against Sadler, it became painfully evident that Sadler was woefully underinsured.[1]

About one month after the vehicular accident, on June 20, 1996, Sadler conveyed her waterfront home to her two siblings for $10.00. At that time, Sadler's home had a fair market value of $650,000. When Prophet learned of the transfer, he lodged a fraudulent conveyance suit against Sadler and her siblings, seeking to set aside the transfer.

In 1999, Sadler settled both of Prophet's cases for almost $1,000,000, a sum well in excess of her policy limits; her insurer, USF & G, contributed the amount of money available under the policy. Thereafter, appellant instituted suit against Loomis for $2,000,000, claiming that Loomis was negligent because it knew of Sadler's financial position, yet failed to provide her with periodic quotes as to the cost of additional protection, or sufficient information to enable her to make an informed decision as to an appropriate level of liability cover-

---

1. It is unclear whether the policy provided coverage of $100,000 per person or per occurrence. Appellant asserts that she had coverage of $100,000 per person, while Loomis states that the policy had a limit of $100,000 per occurrence. A copy of the policy was not included in the Record Extract or the record. Because Prophet was the only claimant, however, the discrepancy is not material.

 Similarly, neither the Record Extract nor the record contains a copy of Prophet's complaint. Moreover, the parties have not specified the date when Prophet filed suit.

age. Appellant sought to recover the value of her settlement with Prophet as well as damages for mental anguish.

Loomis subsequently moved for summary judgment, asserting that it did not owe appellant a duty to counsel her regarding the appropriate amount of automobile liability coverage, and she was not entitled to compensatory damages for mental anguish. After the court granted Loomis's motion, this appeal followed. Appellant presents three questions for our consideration:

I. Did the lower court err in granting summary judgment and thereby determining, as a matter of law, that an insurance agent owed no duty to his client?

II. Did the lower court err in determining as a matter of law that plaintiff Evelyn Sadler was not damaged when her home was transferred to a motorcyclist that she had injured as part of the settlement of the claims filed by the motorcyclist?

III. Did the lower court err when it disregarded plaintiff Evelyn Sadler's sworn testimony concerning the physical manifestations of her emotional distress and determined as a matter of law that emotional damages were not compensable?

For the reasons set forth below, we conclude that Loomis did not have a continuing, affirmative tort duty to render unsolicited advice to Sadler concerning the advisability or availability of liability coverage in a greater amount than was selected by Sadler. Rather, " 'the onus is ... squarely on the insured to inform the agent of the insurance he requires.' " *Charlin v. Allstate Insurance Co.*, 19 F.Supp.2d 1137, 1142 (C.D.Cal.1998) (citation omitted). Therefore, we shall affirm.

## FACTUAL SUMMARY

Evelyn Sadler was born on May 11, 1919, and she has been driving since 1937. Sadler never married and, at the time of the accident in 1996, she still resided in the family home, located at 824 Bywater Road in Annapolis, where she had lived since 1951. Until her death in 1990, appellant's mother

resided in the same house. When Sadler's mother died, Sadler became the sole owner of the home. Along with her brother and sister, Sadler also owned three other real properties, which were sold in the 1990's.

Following Sadler's graduation from high school, she embarked on a course of study in commercial bookkeeping, shorthand, and math. Sadler's skills were put to use during the 50 years that she worked in the family business, Sadler's Hardware, located in Annapolis. Appellant's duties at the business included keeping the books, payment of bills, and handling loan payments. When Sadler's Hardware incorporated in 1977, long after the death of appellant's father in 1943, appellant, her mother, and her siblings became directors, stockholders, and corporate officers.

Sadler's Hardware procured its business insurance through E. Churchill Murray. Later, that agency became known as Murray, Martin & Olsen ("Murray"). Although appellant was not primarily responsible for handling the insurance needs of the business, she testified at her deposition that she reviewed each insurance policy and verified that the amount of coverage corresponded to what had been discussed with the insurance agency. At about the time that Sadler's Hardware went out of business in 1987, Loomis acquired the Murray agency.

Since 1941, Sadler has continuously utilized the same insurance agency that was used by the family business. Thus, for over 50 years, appellant was a customer of both Murray and its successor, Loomis. Indeed, since the time that Loomis acquired Murray, appellant obtained her homeowner's insurance and automobile liability insurance from Loomis. Nevertheless, appellant never had a "special person" at Loomis with whom she dealt for her insurance needs. Appellant asserts in her brief that, "[o]nce The Loomis Company took over, there were no more personal meetings" with an insurance agent. Rather, Sadler acknowledges that she "had contact" with Loomis only "when she had a question."

At her deposition, appellant recalled various times when she had occasion to contact a representative of Loomis. After the

death of Sadler's mother in 1990, for example, appellant notified Loomis to remove her mother as an insured. In 1996, Sadler telephoned Carol Scaffe, a Loomis agent, and instructed her to remove certain items of silver from coverage under her homeowner's policy, because Sadler had distributed those particular pieces to members of her family and no longer owned them. On another occasion, appellant asked Scaffe to correct an error as to the year of construction of her home.

At the time of the underlying accident, Sadler had replacement coverage for her home in the amount of $231,000. In addition, Sadler had coverage of $23,825 for her silverware. With respect to the $100,000 coverage under appellant's automobile liability insurance, Sadler said at her deposition: "I assumed I had enough." Sadler acknowledged that she understood that if she was involved in an automobile accident for which she was deemed at fault, her liability insurer had no obligation to pay more than the stated policy limit of $100,000, regardless of the actual amount of damages. But, Sadler maintained that she did not realize that she would be liable for any shortfall. The following deposition testimony is relevant:

[APPELLEE'S ATTORNEY]: You paid this [automobile insurance premium] according to your ... handwritten notation on August 3, '95, by the check number set forth there, correct?

[SADLER]: Yes.

[APPELLEE'S ATTORNEY]: That is in your handwriting?

[SADLER]: Yes.

* * *

[APPELLEE'S ATTORNEY]: You knew when you paid this bill that the liability limit was $100,000?

[SADLER]: Yes.

[APPELLEE'S ATTORNEY]: You knew that if you were in an accident and it was your fault, USF & G would pay no more than $100,000?

[SADLER]: Yes.

[APPELLEE'S ATTORNEY]: You knew that if you were in an accident and the damage or judgment was greater than $100,000, you would [have] to pay any excess?

[SADLER]: No.

[APPELLEE'S ATTORNEY]: Okay. Let me ask you, then, who would pay the excess in that case. If there was an accident in which you were at fault and there was an award or a judgment greater than $100,000, who would pay the amount over $100,000? . . . .

* * *

[SADLER]: I never thought about it because I never dreamed that I would be in an accident like that.

[APPELLEE'S ATTORNEY]: Okay.

[SADLER]: You can see, they gave me a safe driver renewal.

[APPELLEE'S ATTORNEY]: I understand. I understand. Did you ever discuss—

[SADLER]: $100,000 is a lot of money to me.

* * *

[APPELLEE'S ATTORNEY]: Okay. You'll agree with me that when you paid this bill [on August 3, 1995] that you had to know that if there was an awful accident in which you were at fault and the damages were over $100[,000] that USF & G would only pay the $100,000, correct?

[SADLER]: I never dreamed that it would be that much. I never dreamed that I would be in an accident that would cost that much.

[APPELLEE'S ATTORNEY]: Okay. But you agree that the limit that USF & G was contractually obliged to pay was only $100,000?

[SADLER]: Yes.

From time to time over the years, Sadler received written correspondence from Loomis pertaining to her various insurance policies. For example, Sadler received letters from Loomis dated February 17, 1993, and August 5, 1993, which requested, *inter alia,* that she contact Loomis if she had

questions about her automobile coverage. The letter of February 17, 1993 stated, in relevant part:

RE: AUTO POLICY PPA10147968609

Dear Ms. Sadler:

[USF & G] is asking that the enclosed Medical Report be completed and signed by your family physician and returned to our office as soon as possible.

* * *

This in no way reflects on your driving ability but is something that is required by the companies as you get older.

* * *

*Should you have any questions regarding this request or on your policy coverages, please feel free to contact our office.*

(Emphasis added).

Similarly, the letter of August 5, 1993, stated, in relevant part:

RE: Automobile Insurance

Dear Ms. Sadler:

I am pleased to enclose the renewal of your Automobile Insurance, which renews in August.... This extends your coverage for the next year.

As you can see, USF & G has changed their policy and billing format. A cover letter from the Company is also enclosed giving you a further explanation. *Please take a few minutes to review your policy and coverages, and if there are any questions, please let us know.*

(Emphasis added).

Some of the letters from Loomis should have alerted Sadler generally to the issue of the adequacy of her coverage. For example, Sadler received letters from Loomis dated September 16, 1993, and September 21, 1994, concerning the renewal of the fire insurance for her real property, in which Loomis expressly mentioned the amount of coverage. In contrast to the correspondence concerning the automobile liability policy, Loomis specifically suggested that Sadler consider the adequa-

cy of the policy limits. The letter stated: "If you feel this limit is not sufficient, or if any other changes are necessary, feel free to contact our office." Similarly, in a letter dated November 17, 1994, concerning Sadler's homeowner's policy, Loomis expressly suggested that appellant consider whether the amount of her coverage was appropriate, stating:

In reviewing your Homeowners Insurance policy, which will be renewing in February, *I wanted to offer a suggestion to make sure you are carrying the proper limit of coverage on your scheduled silverware.*

*It appears no changes, deletions, additions, or updates have been done to your schedule in many years. It is always a good idea to look in to this every few years to make sure the values stay accurate. I am sure, should a loss occur, you would want to be properly covered.*

\* \* \*

I look forward to hearing from you regarding this matter, and with any other questions you may have relating to your *insurance coverages.*

(Emphasis added).[2]

Additionally, by letter dated March 14, 1996, Loomis advised Sadler of an increase in the rates for the renewal of her homeowner's policy. Loomis wrote, in part:

There has been an increase in homeowners rates that is reflected in your February renewal. We can discuss this increase and also transfer the coverage to another company if you would like.

---

**2.** To be sure, a letter from a broker suggesting that an insured should increase her homeowner's or fire insurance coverage to protect the market value of a home or the appreciation in value of an item of silver is not precisely comparable to a letter alerting the insured to the need to protect one's assets from a judgment in excess of the limits of a liability policy. Nevertheless, even if Loomis did not specifically focus appellant's attention on the adequacy of her automobile liability coverage, Loomis's letters provided some notice to Sadler as to the general issue of adequacy of insurance coverage. Appellant was also invited to contact Loomis with questions about her policies, but she never did so with regard to her automobile liability policy.

Please do not hesitate to contact this office for a review of your coverage and premium prior to the expiration date.

On June 20, 1996, about a month after the accident, appellant conveyed her Bywater Road home to her siblings, in fee simple, for just $10.00. Pursuant to a contemporaneous Trust Agreement, the parties agreed that appellant would reside in the home for five years, until June 19, 2000. In a report of August 2, 1996, the home was appraised as of June 20, 1996, and had a fair market value of $650,000. Yet, as we noted, the house was insured for less than $250,000 at the time of the accident.

Appellant conceded that she never gave Loomis a property appraisal prior to the accident. On the other hand, the record does not reflect that Loomis ever asked for one or suggested that Sadler obtain one. Moreover, prior to the accident, appellant never asked Loomis to increase the insurance coverage for the house to reflect its actual market value.

In early 1999, Prophet settled his fraudulent conveyance action with appellant and her siblings, and he settled his tort suit with appellant. As we noted, the total settlement was valued at almost $1,000,000. Appellant's automobile liability insurer paid Prophet the maximum sum available under Sadler's policy, and appellant paid Prophet $210,000 in cash. Additionally, the parties executed a Consent Judgment, setting aside the conveyance of the house from Sadler to her siblings, and vesting title with Prophet's attorney, as trustee for Prophet. In accordance with the agreement, Sadler is permitted to remain in the house until December 15, 2001.

On May 5, 1999, following Sadler's settlement with Prophet, Sadler filed suit against Loomis. She alleged, *inter alia,* that she "relied on the services of the insurance brokers to select the appropriate insurance coverages and companies for her protection." Further, she alleged that Loomis knew or should have known of Sadler's financial position, the value of her house, and that she was underinsured. In addition, Sadler asserted:

11. Defendant The Loomis Company had a duty to reasonably evaluate Evelyn E. Sadler's financial exposure and insurance needs. Had [appellee] reasonably evaluated [appellant's] financial exposure, it should have secured automobile liability insurance coverage in an amount sufficient to protect [appellant's] property from attachment. . . .

12. [Appellee] acted in a negligent fashion in failing to secure appropriate automobile insurance coverage limits by:

(a) Failing to recognize [appellant's] financial exposure;

(b) Failing to advise, warn and counsel [appellant] as to her insurance needs;

(c) Failing to monitor [appellant's] financial situation as to recognize that she possessed an insufficient amount of insurance coverage to reasonably protect her property;

(d) And in other fashions to be shown at trial.

13. As a direct and proximate cause of [appellee's] negligence, [appellant's] motor vehicle remained insufficiently insured and [appellant] was forced to convey her home and substantially all of her cash to settle the litigation with Timothy A. Prophet and to pay for legal counsel to assist her in the defense of her property. She also suffered mental anguish in being forced to give up her home of almost fifty (50) years and to divest herself of cash which otherwise would have brought security to her for the balance of her life.

On July 3, 2000, after the close of discovery, Loomis moved for summary judgment. Appellee asserted that, as a matter of law, an insurance agent does not owe a continuing duty to an insured to render advice about the appropriate amount of liability coverage. Loomis also contended that there was no merit to Sadler's claim for damages based on the transfer of her residence to Prophet as part of the settlement, because Sadler no longer owned the home at that time, having conveyed it to her siblings one month after the accident. Further, Loomis argued that Sadler was not entitled to recover damages for "mental anguish," because such damages are not compensable for mere loss of property, absent a showing of

fraud, malice, or intentional conduct, and because Sadler manifested no objective signs of mental distress. Sadler opposed the motion.

At the motion hearing on July 24, 2000, Sadler never claimed that she did not understand the purpose of liability insurance.[3] Nor did she assert that she did not know she could request an increase in coverage. Moreover, Sadler knew that her home was protected for approximately $200,000, a sum twice the amount of her automobile liability coverage.

In support of the negligence claim, appellant's counsel proffered the deposition testimony of two experts: Vincent Boylan, Jr., an executive with a Maryland insurance brokerage firm, and Stanley Lipshultz, Esquire, an attorney with a special knowledge of insurance brokerage and agency. Through counsel, appellant also proffered two duties of care owed by an insurance agent or broker to the insured. First, an insurance broker or agent has a duty to provide the insured with sufficient information to enable the insured to determine an appropriate amount of insurance to protect the insured's assets. Second, the insurance agent or broker has a duty to provide periodic quotes regarding the cost of additional or increased coverage. Appellant's attorney stated, in relevant part:

I have enlisted the aid of two experts. One Vincent Bo[y]llan who is a senior vice president of an insurance agency, 25 years or more in practice who says that . . . *there is a duty, the standard of care for insurance agents in Maryland, is that they do two thing[s].*

*First, they counsel, they educate so that someone can be put on notice that they even have a question to ask. That is, until we are given at least some information to understand that there is a relationship between the liability coverage that we have and the property that we want to*

---

**3.** Indeed, by securing liability coverage in an amount five times greater than the statutory requirement, it would seem that Sadler knew the important protection provided by such insurance. *See* Md.Code (1977, 1992 Repl. Vol), § 17–103 of the Transportation Article.

*protect,* until we have the information we can't even ask the question. How much coverage should I have.

You'll get people responding by saying, if you ask them how much liability coverage they have, they will say they have full coverage which of course, has no meaning. So until they're at least given some indication, some reason to even ask the question so that they can know that the reason that you have liability insurance is to protect your life savings, to protect the real estate that you own, until they're given some counsel in that regard they can't even ask the right question. So that's duty number one.

*And duty number two is that on a periodic basis the insurance agent is to provide quotes for extra coverage so that even in that fashion it may encourage a question to be asked.* If once a year when you get your policy it says, this is the amount of coverage that you have but for only $200 more which of course, was the cost for that extra insurance in this case you could have a million dollars worth of coverage.

At least under those circumstances it may peak [sic] an inquiry. *And Mr. Bo[y]lan says that there is a requirement on a periodic basis to provide those quotes for how much it would cost for extra coverage. Second expert is Stanley Lipshultz....* He was a practicing attorney for over 25 years, his practice was limited to insurance work.

He also ... has a number of designations in the insurance field, he is a charter property underwriter. He teaches classes to the independent insurance agents association which is the association to which the Loomis Company belongs. *And one of the things that he teaches is that you have the obligation first to counsel your customers along the lines that I have outlined and second, to provide them on a periodic basis with quotes for how much it would cost to buy increased limits.*

And both of them, both Bo[y]lan and Lipshultz have testified that it was the standard in the industry at that time for somebody with assets as Ms. Sadler. Because recognize the Loomis Company not only insured Ms. Sadler's automo-

bile and her home but ... the structure itself was worth $200,000 because that's what they insured the structure for. (Emphasis added).

At the conclusion of the hearing, the court granted summary judgment in favor of Loomis as to Sadler's claim for mental anguish, but held the remaining issues *sub curia.* The court granted summary judgment in favor of Loomis on the remaining claims on July 31, 2000. In its Order, the court stated, in relevant part:

1. Summary judgment is hereby entered in this case in favor of Loomis against Sadler, since there is no dispute of material facts and since Loomis is not liable to Sadler for negligence on account of the amount of liability insurance contained in her automobile policy at the time of her May 13, 1996 accident.

2. The largest element of damage claimed in the case is for alleged loss of the 824 Bywater Road home which is claimed to have had a fair market value of $650,000. The Court also grants summary judgment as to this element of damage since Ms. Sadler did not own title to the home at the time of the January 27, 1999 settlement with Timothy A. Prophet, and since as a result of the settlement she obtained a right to remain in the home until December 15, 2001, which is approximately six months longer than she would legally have been entitled to reside there under the June 20, 1996 Trust Agreement and Deed which conveyed legal title to her brother and sister, as trustees.

3. Ms. Sadler's Complaint also claims damages for mental anguish. Damages for mental anguish are not recoverable in a case such as this as a matter of law, and summary judgment is therefore also granted as to this element of damages.

At the end of its Order, the court made the following comment:

During the hearing on the Motion for Summary Judgment, the Court raised the question of whether, based on [appellant's] proffer regarding the basis of her experts'

opinions, it was possible that the trial judge may strike the expert testimony as not having a sufficient factual basis to support the experts' opinions. Although this Court believes that may be an eventual possibility, that fact played no part in the Court's decision to grant Summary Judgment.

We shall include additional facts in our discussion.

## STANDARD OF REVIEW

Maryland Rule 2–501 establishes a two-part test for summary judgment. "In deciding a motion for summary judgment ... the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see Okwa v. Harper*, 360 Md. 161, 178, 757 A.2d 118 (2000); *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Philadelphia Indem. Ins. Co. v. Maryland Yacht Club, Inc.*, 129 Md.App. 455, 465, 742 A.2d 79 (1999). In order to defeat a claim for summary judgment, the party opposing the motion must produce evidence demonstrating a genuine dispute of material fact. *Scroggins v. Dahne*, 335 Md. 688, 691, 645 A.2d 1160 (1994); *Berringer v. Steele*, 133 Md.App. 442, 470, 758 A.2d 574 (2000). A material fact is one that will alter the outcome of the case, depending upon how the factfinder resolves the dispute. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Faith v. Keefer*, 127 Md.App. 706, 734, 736 A.2d 422, *cert. denied*, 357 Md. 191, 742 A.2d 521 (1999). Moreover, mere general allegations or conclusory assertions of a disputed fact will not suffice. *Beatty*, 330 Md. at 738, 625 A.2d 1005. Rather, the party who opposes summary judgment must present the court with facts " 'in detail and with precision.' " *Philadelphia Indem. Ins. Co.*, 129 Md.App. at 465, 742 A.2d 79 (quoting *Beatty*, 330 Md. at 737–38, 625 A.2d 1005).

The trial court must resolve all factual disputes, including reasonable inferences drawn from the facts, in favor of the

non-moving party. *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 94, 756 A.2d 963 (2000); *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 345, 658 A.2d 675 (1995); *Electronics Store, Inc. v. Cellco P'ship*, 127 Md.App. 385, 395, 732 A.2d 980, *cert.denied*, 356 Md. 495, 740 A.2d 613 (1999). Moreover, in deciding the motion, the trial court may not determine the credibility of witnesses. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 326, 389 A.2d 887 (1978); *Thacker v. City of Hyattsville*, 135 Md.App. 268, 286, 762 A.2d 172 (2000).

Like the trial court, we must determine whether there are any genuine disputes of material fact. *Honaker v. W.C. & A.N. Miller Dev. Co.*, 285 Md. 216, 230–31, 401 A.2d 1013 (1979); *Impala Platinum, Ltd.*, 283 Md. at 326, 389 A.2d 887. In our review, we evaluate "the same material from the record and decide[ ] the same legal issues as the circuit court." *Lopata v. Miller*, 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied*, 351 Md. 286, 718 A.2d 234 (1998). If we are satisfied that there is no genuine issue of material fact, then we must determine if the trial court reached the correct legal result. *See Beatty*, 330 Md. at 737, 625 A.2d 1005. Appellate courts will generally uphold a grant of summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872 (1995); *see Gross v. Sussex*, 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron and Metal Co.*, 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

## DISCUSSION

### I.

 In her brief, appellant alleges that Loomis had actual knowledge that she owned substantial assets, including valuable waterfront property in Annapolis for which Loomis procured replacement coverage in excess of $200,000, and that "a large tort judgment . . . would expose" Sadler to the loss of her assets in the event that she was underinsured. Further, Sadler asserts that because she relied on Loomis and its

predecessors for 50 years "to provide proper insurance coverage," she "had no reason to believe that [appellee] would allow her to be woefully underinsured." According to appellant, the risk of loss created by Loomis's alleged negligence materialized when Sadler injured Prophet in the vehicular accident in 1996.

At oral argument, appellant's counsel represented that Sadler does not contend that Loomis had a duty to advise Sadler to increase her liability coverage. Rather, Sadler maintains that Loomis was negligent because it breached the standard of care applicable to an insurance agent or broker with respect to two duties: 1) a duty to provide Sadler with adequate information about automobile liability insurance to enable her to make "an informed decision" or a "reasonable decision" about "liability limits;" 2) a duty to provide Sadler with periodic quotes regarding the cost of greater liability coverage.

Loomis counters that it was not negligent, because an insurance agent or broker "does not have a continuing duty to advise an insured as to the adequacy of his or her limits," absent a "special relationship" between the insured and the broker. According to appellee, Sadler did not establish a special relationship.

Distilled to its essence, Sadler's formulation of Loomis's alleged negligence amounts to a veiled and subtle way of contending that Loomis had an affirmative duty to provide its insured with unsolicited advice or information concerning the suitability or advisability of the level of liability coverage selected by the insured, and the cost of additional coverage. In the extreme, the question might well be this: "[H]ow many of the virtually infinite number of potential risks [is] a broker [required to] anticipate," in order to inform or educate his client about them, in the absence of any request by the insured. *CIGNA Property & Casualty Companies v. Zeitler,* 126 Md.App. 444, 468, 730 A.2d 248 (1999).

On the other hand, this case does not involve a claim that an insurance agent or broker failed to procure particular coverage specifically requested by the insured. Further, this case

does not concern the failure of an agent or broker to inform a client that the coverage actually obtained differs from what was sought or previously provided. Nor does this case involve a "special relationship" between appellant and Loomis; at oral argument, appellant conceded that she did not have a "special relationship" with Loomis.[4]

■ A "special relationship" within the insurance industry is an important concept. A special relationship in the context of insurance requires more than the ordinary insurer-insured relationship. It may be shown when an insurance agent or broker holds himself or herself out as a highly skilled insurance expert, and the insured relies to his detriment on that expertise. A special relationship may also be demonstrated by a long term relationship of confidence, in which the agent or broker assumes the duty to render advice, or has been asked by the insured to provide advice, and the adviser is compensated accordingly, above and beyond the premiums customarily earned. *See* 13 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3D § 46:61, at 46–91 to 92 (1997) ("Couch"); 12 Eric M. Holmes, Holmes' Appleman on Insurance 2D § 86.2, at 394–401 ("Appleman"). In *Parker v. State Farm Mut. Auto. Ins. Co.*, 630 N.E.2d 567, 569–70 (Ind.Ct. App.1994), the court explained:

> [I]t is the nature of the relationship, and not merely the number of years associated therewith, that triggers the duty to advise. Some of the factors relevant to developing entrustment between the insured and the insurer include: exercising broad discretion to service the insured's needs; counseling the insured concerning specialized insurance coverage; holding oneself out as a highly-skilled insurance

---

4. The oral argument was recorded. The following colloquy from the argument is relevant:

 [THE COURT]: Are you contending that ... this case falls within the special relationship exception....?
 [APPELLANT'S ATTORNEY]: Uhm, no.
 [THE COURT]: So, you're conceding that there was no special relationship?
 [APPELLANT'S ATTORNEY]: I am.

expert, coupled with the insured's reliance upon the expertise; and receiving compensation, above the customary premium paid, for expert advice provided.

(Internal citations omitted).

Maryland statutory law is consistent with the concept set forth above. Maryland Code (1997, 2000 Supp.), § 10–201(b) of the Insurance Article ("Insur."), defines an insurance adviser, as distinguished from an insurance agent or broker. It states, in relevant part:

### § 10–201. Definitions.

(a) *In general.* In this subtitle the following words have the meanings indicated.

(b) *Adviser.*—"Adviser" means a person that, *for compensation:*

(1) examines or offers to examine a policy ... for the purpose of giving, or gives or offers to give, advice or information about:

(i) *the terms, conditions, benefits, coverage, or premium of a policy ...;* or

(ii) the advisability of changing, exchanging, converting, replacing, surrendering, continuing, or rejecting a policy ... from an insurer; or

(2) represents to the public that the person gives or is engaged in the business of giving advice or information to holders of policies or annuity contracts by use of the title "insurance adviser", "insurance specialist", "insurance counselor", "insurance analyst", "policyholders' adviser", "policy holders' counselor", "refund company" or other similar title:

(i) in or on advertisements, cards, signs, circulars, letterheads, or elsewhere; or

(ii) in any other manner in which public announcements are made.

Insur. § 10–201 (emphasis added).

An insurance agent or broker is not necessarily an insurance "adviser." *See* 12 M.L.E. *Insurance* § 49, at 425 (1999) ("Certain individuals, such as licensed agents and brokers,

among others, are not covered under the sections of the act pertaining to advisers."). The terms "insurance agent" and "insurance broker" are sometimes used interchangeably, although they are not the same. It is useful to review these terms in order to clarify Loomis's role.

A "broker" is defined in Insur. § 1–101(i), as follows:

(i) *Broker.*—"Broker" means a person that, for compensation, solicits, procures, or negotiates insurance contracts or the renewal or continuance of insurance contracts:

(1) for insureds or prospective insureds other than the broker; and

(1) not for an insurer or agent.

■ An insurance broker generally "acts as the agent for its customers [in] seeking insurance." *Green v. H & R Block, Inc.*, 355 Md. 488, 515, 735 A.2d 1039 (1999). The *Green* Court explained:

"An insurance ... broker, is one who acts as a middle man between the assured and the insurer, and who solicits insurance from the public under no employment from any special company, but having secured an order, either places the insurance with a company selected by the assured, or in the absence of any selection by him, then with a company selected by the broker. *Ordinarily, the relation between the insured and the broker is that between principal and agent.*"

*Id.* (quoting *American Casualty Co. v. Ricas*, 179 Md. 627, 631, 22 A.2d 484 (1941)) (emphasis added in *Green*); *see Popham v. State Farm Mut. Ins. Co.*, 333 Md. 136, 156 n. 10, 634 A.2d 28 (1993); *Medical Mut. Liab. Ins. Soc. of Md. v. Mut. Fire, Marine and Inland Ins. Co.*, 37 Md.App. 706, 714, 379 A.2d 739 (1977). Thus, "[a]n insurance broker is ordinarily employed by a person seeking insurance, and when so employed, is to be distinguished from [the] ordinary insurance agent, who is employed by insurance companies to solicit and write insurance by, and in the company." *Ricas*, 179 Md. at 631, 22 A.2d 484.

■ In contrast, "an insurance agent, so far as the insurer is concerned, is a person expressly or impliedly authorized to represent it in dealing with third parties in matters relating to insurance." *Ricas,* 179 Md. at 631, 22 A.2d 484. Insur. § 1–101(c) defines an insurance agent, in part, as follows:

(c) *Agent.*—(1) "Agent" means a person that, for compensation, solicits, procures, negotiates, or makes insurance contracts or the renewal or continuance of these insurance contracts for persons issuing the insurance contracts.

■ Although Loomis is sometimes referred to here as an insurance agency, it is clear that Loomis functioned as a broker. An insurance agent is "tied to his company," while a broker is an "independent middleman not tied to a particular company." 43 Am.Jur.2d, Insurance § 109, at 187 (1982). Moreover, "[e]very insurance broker is in a sense an agent, but the latter term is the more generic, and every insurance agent is not a broker." *Id.* "Whether a person is a broker or an agent is determined not by what he is called but by what he does." *Medical Mut. Liability,* 37 Md.App. at 714, 379 A.2d 739.

## II.

■ Generally, an insurance agent or broker owes a duty to " 'exercise reasonable care and skill in performing his duties. And if such a representative fails to do so, he may become liable to those ... who are caused a loss by his failure to use standard care.' " *Insurance Co. of No. America v. Miller,* 362 Md. 361, 386, 765 A.2d 587 (2001) (quoting *Bogley v. Middleton Tavern, Inc.,* 288 Md. 645, 650, 421 A.2d 571 (1980)); *see Jones v. Hyatt Insurance Agency, Inc.,* 356 Md. 639, 657–58, 741 A.2d 1099 (1999); *Popham,* 333 Md. at 153, 634 A.2d 28. Typically, the tort duty of an agent or broker stems from a relationship of "confidence and trust" that an insured has placed in an "experienced and knowledgeable" insurance agent or broker. *See Jones,* 356 Md. at 657, 741 A.2d 1099; *Lowitt*

*v. Pearsall Chemical Corp.*, 242 Md. 245, 253, 219 A.2d 67 (1966).

> To prove negligence, a plaintiff must show four elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached the duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."

*Insurance Co. of North America,* 362 Md. at 387, 765 A.2d 587 (quoting *Baltimore Gas & Elec. Co. v. Flippo,* 348 Md. 680, 700, 705 A.2d 1144 (1998)); *see Jones,* 356 Md. at 653, 741 A.2d 1099.

■ " '[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another....' " *Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 655, 762 A.2d 582 (2000) (citation omitted). The "duty," an essential element of a negligence claim, means a legally cognizable duty. *See Coates v. Southern Md. Elec. Cooperative, Inc.,* 354 Md. 499, 509, 731 A.2d 931 (1999). In a negligence action, the question of whether there is a legally cognizable tort duty is an issue of law to be decided by the court. *See Valentine v. On Target, Inc.,* 353 Md. 544, 549, 727 A.2d 947 (1999); *Bobo v. State,* 346 Md. 706, 716, 697 A.2d 1371 (1997); *Rosenblatt v. Exxon,* 335 Md. 58, 75, 642 A.2d 180 (1994). "Ultimately, . . .'the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion' " as to whether the plaintiff's interests merit "legal protection" from the defendant's conduct. *Coates,* 354 Md. at 509, 731 A.2d 931 (citation omitted). *See Eisel v. Board of Educ. of Montgomery County,* 324 Md. 376, 385–86, 597 A.2d 447 (1991) ("A tort duty is 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' " (citation omitted)). But, there "is no set formula" to determine whether a tort duty exists. *Coates,* 354 Md. at 509, 731 A.2d 931. Moreover, in the absence of a special relationship between the parties,

"courts ordinarily will not impose an affirmative duty to protect the interests of another. . . ." *State v. Johnson,* 108 Md.App. 54, 65, 670 A.2d 1012 (1996).

In *Jones,* 356 Md. at 658, 741 A.2d 1099, the Court explained the considerations involved in regard to recognizing a tort duty. The Court said:

"In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability." (Footnote omitted).

(Quoting *Jacques v. First Nat'l Bank,* 307 Md. 527, 534–35, 515 A.2d 756 (1986)).

Appellant relies primarily on *Popham,* 333 Md. 136, 634 A.2d 28, to support her contention that Loomis owed an affirmative, continuing duty under common law to provide her with information as well as periodic quotes pertaining to the cost of additional automobile liability coverage, notwithstanding Sadler's failure to request any information about increased liability coverage. In *Popham,* the Court analyzed whether an insurer owed a statutory duty to its insureds to offer uninsured-underinsured motorist ("UIM") coverage up to the limits of coverage provided by an "excess" or "umbrella" personal liability policy purchased by the insureds. *Id.* at 138, 634 A.2d 28. The Court also considered whether the insureds "stated a cognizable claim in negligence" by alleging that the insurer and its agent failed to advise the insureds that they could obtain UIM coverage in an amount equal to coverage under their excess liability policy. *Id.*

Christine Popham suffered serious injuries in an automobile accident, and the driver of the other vehicle, who was at fault, had only minimal liability coverage. Popham was a named insured under her father's automobile policy, for both liability and UIM coverage, in the amount of $100,000/$300,000. In addition, the Pophams had an umbrella or excess personal liability policy with limits of $1,000,000. Although the umbrella policy included automobile liability coverage, it had no UIM coverage. Consequently, the Pophams sued their insurer, State Farm, and its agent, contending that they breached a statutory duty and a common law duty of due care that required them to inform the insureds of their legal right to purchase up to $1 million dollars of UIM coverage, an amount equal to the liability protection afforded under the umbrella policy. The circuit court granted the defendants' motion to dismiss, but the Court of Appeals reversed.

Under Md.Code (1957, 1991 Repl.Vol.), Art. 48A, § 541(c)(2) and (f), which was in effect at the relevant time, an insurer was permitted, but not required, to offer UIM coverage in an amount equal to liability policy limits. Because § 541(f) permitted, but did not require, an excess insurer to offer UIM coverage, the Court concluded that the defendants did not breach a statutory duty. *Popham,* 333 Md. at 152, 634 A.2d 28. Notwithstanding the absence of a statutory obligation to offer such coverage, the Court concluded that the plaintiffs stated a claim for negligence, based on the defendants' alleged failure to advise the insureds of the option to purchase UIM coverage in an amount equal to the coverage provided under the excess liability policy. *Id.* at 155–56, 634 A.2d 28. The Court said: "A trier of fact could conclude that [the agent] failed to exercise the requisite skill and care of an insurance agent in that regard." *Id.* at 156, 634 A.2d 28. Moreover, because the agent could bind the insurer, his negligence, if any, was attributable to the insurer. *Id.* at 157, 634 A.2d 28. Therefore, the Court concluded that "the complaint sets forth a cause of action in negligence...." *Id. Cf. Dann v. State Farm Mut. Auto. Ins. Co.,* 98 Md.App. 42, 632 A.2d 241 (1993), *cert. denied,* 334 Md. 19, 637 A.2d 1192 (1994) (concluding that

court erred in granting summary judgment motion of insurer and agent because insureds disputed that they were informed of statutory right to obtain UIM coverage in an amount equal to limits of their liability policy).

In our view, the instant case is distinguishable from *Popham*. When the insured in *Popham* procured the umbrella policy, the insured had an option to buy UIM coverage of an equal amount, in conjunction with the purchase of the umbrella policy. In essence, then, the optional UIM coverage was an optional component of the umbrella policy itself, available only because the insureds were purchasing the underlying liability coverage. The *Popham* case did not concern an allegation that the agent failed to advise the insured about what amount of coverage was appropriate, or the cost of additional insurance.

Conversely, this case does not concern an alleged failure by the broker or agent to disclose a legal right to purchase optional coverage available as part of, and because of, the purchase of an automobile liability policy. Rather, this case concerns the issue of whether Loomis had a duty to advise Sadler regarding the adequacy of the *amount* of her automobile liability coverage.

We have not found any Maryland case that has imposed on an insurance agent or broker the affirmative duty to make an unsolicited recommendation concerning appropriate coverage, absent a special relationship or a request from the insured to provide such information. Numerous other jurisdictions have considered the issue, however, and they have done so in the context of a variety of types of insurance policies. We discuss several of these cases, *infra*. Uniformly, absent a special relationship or a particular request by the insured, the courts of other states have rejected the duty that appellant urges us to recognize here. Moreover, we glean from these decisions many sound considerations undergirding the view that an insurance agent or broker ordinarily has no affirmative duty to provide unsolicited advice to an insured regarding the adequacy of insurance coverage.

Many of the decisions of other jurisdictions focus on the view that the insured usually is in the best position to assess the value of his or her assets, and the extent of potential loss in the event that a risk materializes, whether by adverse judgment, business interruption, fire, theft, or the like. *See Murphy v. Kuhn,* 90 N.Y.2d 266, 660 N.Y.S.2d 371, 682 N.E.2d 972, 976 (1997)(discussed, *infra); M & E Mfg. Co., Inc. v. Frank H. Reis, Inc.,* 258 A.D.2d 9, 692 N.Y.S.2d 191 (1999) (discussed, *infra).* Similarly, the insured is generally considered best able to balance the factors relating to potential economic loss against the expense of purchasing additional insurance, the likelihood that a particular risk will materialize, and the insured's own comfort level with the risks versus the cost of greater protection. *See Cleary v. Country Mut. Ins. Co.,* 63 Ill.App.3d 637, 20 Ill.Dec. 547, 380 N.E.2d 525, 526 (1978) (stating that the law does not impose a duty on an insurer to review "the adequacy of an insured's coverage each time a policy is due for renewal;" insured "best knows his need for insurance and the premium he can afford" and can request modification of terms when premiums are due).

These cases suggest, then, that the amount of insurance coverage is "a trade off between cost and risk, [and] risk is in part subjective and dependent on other available resources...." *Peter v. Schumacher Enter., Inc.,* 22 P.3d 481, 486 (Alaska 2001). Thus, "the question of adequacy of coverage is necessarily a matter of [personal] opinion." *Id.* at 486. As the court said in *Jones v. Grewe,* 189 Cal.App.3d 950, 951, 234 Cal.Rptr. 717 (Cal.App.1987), an insurance agent has no greater "ability to accurately forecast the upper limit of any damage award in a negligence action against the insured" than does anyone else.

Moreover, some of the cases reflect a belief that responsibility for the amount of coverage ought to fall on the insured, because an agent or broker cannot readily verify the accuracy of financial information that an insured provides, and must instead rely on the information supplied by the insured. Absent full disclosure by an insured, which an agent or broker cannot compel, an agent or broker would have no way to

ascertain an insured's exposure. Nor would the agent or broker necessarily know of a change in the insured's circumstances or economic status, which could affect the suitability of existing coverage. *See, e.g., Gabrielson v. Warnemunde,* 443 N.W.2d 540, 543 (Minn.1989)(stating that an insurance agent does not have "a legal duty to inquire about changed circumstances of his client and update the homeowner's policy at the time it is renewed"); *Suter v. Virgil R. Lee & Son, Inc.,* 51 Wash.App. 524, 754 P.2d 155, *cert. denied,* 111 Wash.2d 1005 (1988) (discussed, *infra*).

Further, several cases eschew the idea of a broker or agent serving in an advisory capacity. They suggest that to require an agent or broker to offer unsolicited advice to its insured, or even to inquire of its insured as to the suitability of existing coverage, would transform insurance agents or brokers into "risk managers" with "guarantor status," *Murphy,* 660 N.Y.S.2d 371, 682 N.E.2d at 976, or " 'personal financial counselors or guardians of the insured [, which] goes well beyond anything required by law or dictated by common sense.' " *Dubreuil v. Allstate Ins. Co.,* 511 A.2d 300, 302 (R.I.1986) (citation omitted).

Still other decisions recognize that the view espoused by appellant could readily encourage an insured who suffers a loss to fabricate that he or she would have bought more insurance had it been recommended. "[T]he creation of a duty to advise could afford the insureds the opportunity to insure after the loss by merely asserting they would have bought the additional coverage had it been offered." *Nelson v. Davidson,* 155 Wis.2d 674, 456 N.W.2d 343, 346 (1990). The concept of such "retroactive insurance," *Schumacher,* 22 P.3d at 486, "turns the entire theory of insurance on its ear." *Farmers Ins. Co., Inc. v. McCarthy,* 871 S.W.2d 82, 86 (Mo. App.1994).

Moreover, some rulings suggest that courts should not overlook that imposition of the kind of duty urged by appellant would simply encourage agents and brokers to act "defensively," by advising their customers to purchase the maximum

available coverage, regardless of cost, "rather than more modest packages that most people of similar means would find suitable." *Schumacher*, 22 P.3d at 486. This could readily result in a "mis-allocation of personal resources of individual insureds." *Id.* Conceivably, "the obvious extension" of the position advocated by appellant "would subject [brokers or agents] to liability for failing to advise their own clients of every possible insurance option, or even an arguably better package of insurance offered by a competitor." *Davidson*, 456 N.W.2d at 346; *see Baldwin Crane & Equip. Corp. v. Riley & Rielly Ins. Agency, Inc.*, 44 Mass.App.Ct. 29, 687 N.E.2d 1267, 1269–1270 (1997), (stating that it is only when " 'the agent holds himself out as an insurance specialist, consultant or counselor and is receiving compensation for consultation and advice apart from premiums paid by the insured,' " that the agent owes "a greater duty" to an insured) (citation omitted), *cert. denied*, 427 Mass. 1101, 692 N.E.2d 963 (1998).

Other decisions underscore that the issue presented here is a matter for the state legislatures to resolve. In view of the important public policy considerations, these courts have expressed serious concern about inappropriate judicial law making. *See, e.g., Wang v. Allstate Ins. Co.*, 125 N.J. 2, 592 A.2d 527, 532 (1991) (discussed, *infra*); *Davidson*, 456 N.W.2d at 347 (declining "to impose upon the agent an ongoing duty . . . to advise an insured regarding coverage for an indefinite period of time," or "to inform an insured concerning the availability or advisability of UIM coverage," and concluding that creation of such a duty is a matter of public policy for legislature, not judiciary).

Because many of the cases decided by the courts of other states are helpful in elucidating the issue presented here, we turn to discuss a few of them.

*Murphy v. Kuhn*, 90 N.Y.2d 266, 660 N.Y.S.2d 371, 682 N.E.2d 972 (1997), is instructive. The case arose from a fatal automobile accident that occurred in Florida in 1991, in which the insured's son was at fault. The defendants had provided the insured's homeowner's insurance, automobile coverage,

and various business insurances since the 1970's. In 1990, the insured transferred the insurance coverage for his son's car from his personal policy to his business's commercial policy, but the vehicle remained titled in Murphy's name. Nevertheless, the insured never sought to increase the liability limits on the commercial policy, set at $250,000 per person and $500,000 per occurrence. After the accident, the insured sued the insurance agency and agent, alleging, *inter alia*, "professional negligence" based on the failure to advise him about the need for additional coverage.

On appeal, the New York Court of Appeals considered whether an insurance agency and its agent were liable to Murphy, a former customer, based on a failure to advise him of "possible additional insurance coverage needs." *Id.* 660 N.Y.S.2d 371, 682 N.E.2d at 973. The court recognized that, absent a specific request by the customer, "insurance agents have no continuing duty to advise, guide or direct a client to obtain additional coverage." *Id.* 660 N.Y.S.2d 371, 682 N.E.2d at 976 (citation omitted). No duty was found, because no request was made by the customer for additional coverage, and there was no "special relationship" between the parties, notwithstanding their extended relationship. Moreover, noting that Murphy's "liability coverage had remained the same since 1984," the court commented that "[s]uch lack of initiative or personal indifference cannot qualify as legally recognizable or justifiable reliance." *Id.* 660 N.Y.S.2d 371, 682 N.E.2d at 975. We consider persuasive the court's reasoning in rejecting the insured's claim. The court said, at 660 N.Y.S.2d 371, 682 N.E.2d at 976:

Insurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status. Insureds are in a better position to know their personal assets and abilities to protect themselves more so than general insurance agents or brokers, unless the latter are informed and asked to advise and act.

(Internal citations omitted).

*Wang v. Allstate Ins. Co.*, 125 N.J. 2, 592 A.2d 527 (1991), is also helpful. Wang was injured in 1983 when she drove her

car into a tree in an effort to avoid two dogs that ran into the road. Thereafter, she sued the owners of the dogs, claiming they failed to control them. Although both owners had home-owner's insurance policies, their policy limits were quite low, because they were obtained years earlier, when their houses were worth much less. One family obtained its policy in 1963, when they purchased their home for $17,500; the policy only provided coverage of $25,000. The other family bought their home in 1977 for $49,000, and they obtained their policy at that time, also with coverage of $25,000. Although the policies were renewed regularly, the liability coverage was never increased.

Pursuant to an assignment, Wang sued both insurance companies and the brokers, claiming they breached a duty to the homeowners " 'to periodically and regularly advise them of a need to increase the limits on that insurance coverage.... ' " *Id.* at 530 (citation omitted). The plaintiff further alleged that insurance agents owed a duty to their insureds " 'to periodical-ly advise them, in general terms, of the need to continually review the adequacy of their coverage as economic conditions change.' " *Id.* at 532–33 (citation omitted). Absent a special relationship or a request by the insured, the court disagreed. *Id.* at 535.

The court was "not prepared to find as a matter of law that insurance companies and their agents" have a duty to inform insureds that a policy is "inadequate to protect their assets from potential ... claims because of the appreciated value of their homes, inflationary trends in the area, and increased recoveries being awarded to tort victims." *Id.* at 535. Thus, it held: "We conclude that there is no common law duty of a carrier or its agents to advise an insured concerning the possible need for higher policy limits upon renewal of the policy." *Id.* at 532. Significantly, the court added: "If such a duty would be in the public interest, it is better established by comprehensive legislation, rather than by judicial decision." *Id.*

Nevertheless, the court was mindful that, to reflect current market value, some insurance companies "automatically increased fire and extended coverage limits" or "suggested that insureds do so." *Id.* at 535. It also recognized that "if notice of such an increase in fire and extended coverage can readily be given to the insured, either as an accomplished fact or for an insured's decision to purchase, [there is] no reason why a similar notice could not be given with respect to personal liability coverage." *Id.* But, what the court said as to the policy considerations of a court-imposed duty is particularly noteworthy:

[I]t is difficult to fix the limits of such a proposed duty. The areas of potential liability are many and growing. Defining the scope of the duty would require us to address issues such as whether a broker or agent should be required to inform the insured of the availability of an umbrella policy to increase the coverage limits. Those and other difficult questions are best left to the legislative process. In that setting, such questions can be fully explored and debated with input from the public and the insurance industry....

\* \* \*

We reiterate that the many variables arising out of such a duty suggest that its creation and limitations should more properly be the subject of full adjudication or legislation.... [W]e are disinclined, as a matter of sound public policy, to announce an absolute duty....

*Id.* at 536.

*Suter v. Virgil R. Lee & Son, Inc.,* 51 Wash.App. 524, 754 P.2d 155, *cert. denied,* 111 Wash.2d 1005 (1988), is also useful. There, the Suters (husband, wife, and daughter) appealed from a summary judgment order dismissing their negligence suit against their insurance agency, the "Lee Agency," in which they alleged that it failed to recommend increased liability coverage.

In 1973, the Suters purchased automobile liability insurance through the Mitchell Insurance Agency ("Mitchell Agency"), with policy limits of $25,000 per person and $50,000 per

accident. In 1977, the Mitchell Agency was purchased by the Lee Agency, but the family's existing insurance was left unchanged. Moreover, the plaintiffs never contacted the Lee Agency regarding the adequacy of their automobile liability insurance policy, and merely renewed the policy with the same insurer. One year later, in 1978, when a member of the Suter family was at fault in a fatal automobile accident, the Suters realized that their liability insurance was inadequate. They blamed the Lee Agency, alleging that it held itself out as an insurance specialist and had an obligation to recommend adequate insurance coverage. The family's insurance expert opined that "an insurance agent selling automobile liability insurance should inquire into an insured's assets, income, occupation, and real estate holdings, and should recommend liability coverage for the insured adequate to protect the insured's assets." *Id.* at 156. Moreover, the plaintiffs' expert maintained that, given the Suters' financial status, the Lee Agency "failed to act prudently" by not recommending a liability policy of at least $300,000. *Id.* The trial court disagreed, and awarded summary judgment to the defendant.

On appeal, the court framed the issue as follows: "Did the Lee [A]gency, after acquiring the Mitchell Agency, have a duty to contact the [Suters] and recommend that they purchase an automobile liability policy with greater limits than that in effect at the time of the accident?" *Id.* The court held that, given the lack of a special relationship, the Lee Agency "owed no duty to the Suters to recommend a certain level of automobile insurance coverage." *Id.* at 155. The court reasoned:

> We find ourselves in accord with the view ... that "[t]he general duty of reasonable care which an insurance agent owes his client does not include the obligation to procure a policy affording the client complete liability protection." That decision was justified on the basis that ordinarily the insured knows the extent of his personal assets and his ability to pay better than the insurance agency. *Thus, it is the insured's responsibility to advise the agent of the insur-*

*ance that he wants, including the limits of the policy to be
issued.*

*Id.* at 157 (internal citations omitted) (emphasis added).

*M & E Mfg. Co., Inc. v. Frank H. Reis, Inc.,* 258 A.D.2d 9,
692 N.Y.S.2d 191 (1999), also provides guidance. In that case,
the insured substantially increased its business interruption
insurance in the late 1980's, from $40,000 to $800,000, after the
insurance agent provided the insured with a worksheet to aid
in determining the appropriate level of such coverage. Al-
though the business continued to grow, the agent did not ask
the insured to complete another worksheet, nor did the in-
sured ever ask the agent to do so. When the insured's roof
collapsed at its facility, the insured sustained a major loss in
business, well in excess of the policy limits under its business
interruption insurance. Consequently, the insured sued its
insurance agency, claiming negligence in failing to provide the
insured with adequate information as to the proper amount of
coverage. The insured maintained that the agent should have
conducted an annual review regarding the adequacy of its
coverage. The court disagreed.

The court observed that the plaintiff never asked the defen-
dant to increase its coverage or to complete another work-
sheet to determine the appropriate coverage, nor did the
agent represent that he would do so annually. *Id.* at 193–94.
The court concluded that the agent had no continuing duty to
advise the plaintiff about whether to increase coverage, stat-
ing:

> The insurance agent-insured relationship is not a generally
> recognized professional relationship in which continuing ob-
> ligations to advise might exist but, rather, is an ordinary
> commercial relationship which does not usually give rise to a
> duty to provide such ongoing guidance.

*Id.* at 193. Rather, the court observed that insureds are
generally "in a better position to know ... their own assets,"
and they have the "ability to protect themselves...." *Id.*

Numerous other states are to the same effect; absent a
request from the insured or a "special relationship" between

the insured and the agent or broker, an insurance agent or broker does not owe a continuing or affirmative duty to render unsolicited advice to its insured as to the adequacy of liability coverage. *See, e.g., Schumacher,* 22 P.3d at 486 (concluding that insurance agents do not have a common law duty to advise customers about their insurance coverage, absent a special relationship); *Trupiano v. Cincinnati Ins. Co.,* 654 N.E.2d 886, 889 (Ind.Ct.App.1995) (stating that insured "failed to establish a special relationship" with insurer and its agent and they had no duty to advise the insured concerning adequacy of UIM coverage); *American Family Mut. Ins. Co. v. Dye,* 634 N.E.2d 844 (Ind.Ct.App.1994) (concluding that insurer and its agent were not liable to insured based on failure to advise of availability of UIM coverage); *Craven v. State Farm Mut. Auto. Ins. Co.,* 588 N.E.2d 1294 (Ind.Ct.App.1992) (rejecting claim that insurance agent was negligent based on failure to advise insured that higher amounts of UIM coverage were available); *Banes v. Martin,* 965 S.W.2d 383, 385 (Mo.App. 1998) (involving negligence claim against agent and insurance agency for failing to provide UIM coverage; insured had to "inform [agent] she wanted coverage beyond her previous policy"); *Chase Scientific Research, Inc. v. NIA Group, Inc.,* 96 N.Y.2d 20, 30, 725 N.Y.S.2d 592, 749 N.E.2d 161 (2001) (concluding that although insurance brokers and agents are licensed and held to high standards of education and qualification, they are not required to engage in extensive specialized education and training and therefore not professionals for purposes of special statute of limitations governing malpractice actions for non-medical professionals); *Twin Tiers Eye Care Assoc., P.C. v. First Unum Life Ins. Co.,* 270 A.D.2d 918, 705 N.Y.S.2d 466, 468 (2000) (involving disability policies and stating that "insurance agent has no continuing duty to advise, guide or direct client to obtain" particular coverage); *Ambrosino v. Exchange Ins. Co.,* 265 A.D.2d 627, 695 N.Y.S.2d 767, 769 (1999) (involving allegations that insurance agent negligently failed to procure appropriate coverage for property insurance, and acknowledging that an insurance agent " 'has no continuing duty to advise, guide or direct a client to obtain

additional coverage' " when client never requested any "upgrades") (citation omitted); *Wied v. New York Central Mut. Fire Ins. Co.*, 208 A.D.2d 1132, 618 N.Y.S.2d 467, 468 (1994) (recognizing that insurance agent's duty to customer is defined by customer's request to agent; absent a customer's request, "there is no affirmative duty on an insurance agent to obtain [additional] coverage," and no continuing duty to advise customer to do so); *Blonsky v. Allstate Ins. Co.*, 128 Misc.2d 981, 491 N.Y.S.2d 895, 897 (Sup.1985) (recognizing that an insurance broker does not owe a continuing duty to "advise, guide and direct an insured's coverage."); *Dubreuil, supra*, 511 A.2d at 301–02 (recognizing that neither legislature nor case law "imposed an affirmative duty upon insurance agents to inform prospective customers about coverage available from [competitor] insurers"); *Gates v. Logan*, 71 Wash.App. 673, 862 P.2d 134 (1993) (concluding that, absent special circumstances, insurance agent has no duty to advise insured to increase automobile liability limits); *Meyer v. Norgaard*, 160 Wis.2d 794, 467 N.W.2d 141, 142 (App.1991) (involving negligence claim against insurer and agent based on failure to evaluate insured's needs and to advise of need for greater UIM coverage; agent had "no duty to inform [insured] regarding the availability or advisability of higher uninsured motorist coverage," and no "affirmative obligation, absent special circumstances, to inform about or recommend policy limits higher than those selected by the insured.").

The cases cited above are consistent with the treatises. For example, in 44 C.J.S. *Insurance* § 215, at 411 (1993), it states:

An insurance agent ordinarily assumes only those duties normally found in an agency relationship, and absent an agreement to the contrary, an agent has no duty beyond that specifically undertaken to perform for the client. Thus, an agent ordinarily has no duty to advise the insured on specific insurance matters, or to procure a policy affording complete liability protection.... Moreover, after complying with the obligation to obtain insurance, the insurance agent or broker does not have a continuing duty to advise, guide, or direct the insured's coverage, or, absent special circum-

stances in the relationship with the insured, an affirmative duty to update an insurance policy at the time it is renewed or to inquire whether any changes have occurred to the insured's property which would affect coverage.

Similarly, in 12 Appleman, § 87.6, at 660, it is recognized that "an insurance agent has no general duty to advise an applicant or an insured regarding coverage deficiencies or needs." Nor does an insurance agent have an "ongoing duty of surveillance concerning an insured's constantly changing circumstances," because "the insured is in a far better position to communicate to the agent or insurer than is the agent or insurer to determine on its own initiative". *Id. See also* 4 Couch, § 55:5 at 55–10 (stating that "the general duty of the insurer's agent to the insured is to refrain from affirmative fraud, not to watch out for all rights of the insured and inform the latter of them[; a]bsent a special relationship between the insured and the insurer's agent, an insurer's agent has no duty to affirmatively advise or warn his or her customer of provisions contained in an insurance policy . . .").

## CONCLUSION

 Our resolution of this case does not turn on whether Loomis should have done more to assure Sadler's financial protection. Nor is the outcome based on our conclusion that Sadler was in some way contributorily negligent. Rather, we have determined that, in the absence of a special relationship, an insurance agent or broker has no affirmative, legally cognizable tort duty to provide unsolicited advice to an insured regarding the adequacy of liability coverage.

Sadler testified that she thought $100,000 in liability coverage was "enough," because she never "dreamed" that she would be involved in a serious automobile accident that "would cost that much." Her plight is probably not uncommon; we recognize that some people, especially the elderly, might not keep pace with the modern circumstance of large or runaway verdicts. It does not follow, however, that an insurance agent or broker bears responsibility for identifying those customers

who do not keep current in order to advise them accordingly. Although the record does not reflect the particular number of years for which Sadler had automobile liability coverage in the amount of $100,000, she apparently was insured at that level for several years. Whether that amount of coverage was too low, too high, or just right was a matter for appellant's consideration and determination.

In a sense, it is a matter of business judgment on the part of the broker or agent, and personal preference on the part of the customer, that determines whether a customer or agent pursues a laissez-faire style rather than a proactive, aggressive one. To be sure, some customers prefer the "don't call me, I'll call you" approach with regard to their insurance agents and brokers, believing that they can determine for themselves what they need, and that insurance brokers and agents are just out to sell policies or excessive coverages that are unnecessary. Many of these customers undoubtedly believe that they are able to decide the extent of risk that can or should tolerate, and they know best what they can afford to pay in premiums. On the other hand, there are customers who undoubtedly want an insurance broker or agent who looks out for the customer's interests before a problem develops, and alerts a client to the kinds of insurance available for maximum protection, or who makes suggestions relating to appropriate coverage and adequacy of coverage. For many of the same reasons, some agents or brokers may consider it prudent business practice to adopt a proactive style, and volunteer information to an insured regarding additional types of coverage, the need for increased coverage, or to help the insured assess his or her particular insurance needs. In contrast, others may believe that they should only respond to a customer's particular request, without aggressively attempting to suggest alternatives.

We empathize with appellant's unfortunate situation. We also recognize that other insurance agents may have been more assertive, proactive, or aggressive in suggesting that appellant procure greater protection, and that appellant would have been better served by such an agency. This does not

mean, however, that appellee is liable in tort for failing to recommend to appellant that she secure greater liability protection. Accordingly, we shall affirm.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**