GOVERNMENT EMPLOYEES INSURANCE COMPANY and Michael J. Lina, Jr., Petitioners/Cross–Respondents,

v.

Sandra GRAHAM–GONZALEZ, Respondent/Cross–Petitioner.

State Farm Mutual Automobile Insurance Company, Petitioner,

v.

Maurita Rene Bozinoff, for herself and as the Natural Mother and Next Best Friend of Hannah Nicole Bozinoff, a minor, Respondents.

Nos. S–10666, S–10755, S–10691.

Supreme Court of Alaska.

Feb. 18, 2005.

---

Mark E. Wilkerson, Wilkerson & Associates, and Gary A. Zipkin, Guess & Rudd, P.C., Anchorage, for Petitioners/Cross-Respondents GEICO.

Mark A. Sandberg, Sandberg, Wuestenfeld & Corey, and Dennis M. Mestas, Anchorage, for Respondent/Cross-Petitioner Graham-Gonzalez.

Kimberlee A. Colbo, Hughes Thorsness Powell Huddleston & Bauman LLC, Anchorage, for Petitioner State Farm.

W. David Weed and LeRoy E. DeVeaux, Anchorage, for Respondent Bozinoff.

Alfred Clayton, Jr., Bliss, Wilkens & Clayton, Anchorage, for Amicus Curiae The National Association of Independent Insurers.

Neil T. O'Donnell and W. Michael Moody, Atkinson, Conway & Gagnon, Anchorage, for Amicus Curiae Cheryl Hensel.

David W. Pease, Burr, Pease & Kurtz, Anchorage, for Amicus Curiae Integon Indemnity Corporation.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

Alaska Statute 21.89.020(c) states that insurers "shall ... offer coverage" for protection against uninsured and underinsured motorists (UIM) ranging from $50,000 to $1,000,000 for injury or death of one person. The question presented in these cases is whether application forms which set out the various levels of coverage that are available but do not state the amount of the premium that must be paid violate this statute. We

answer "no" for reasons based on our case law, the common meaning of "offer," indications of what the statute requires in another subsection and in the legislative history, and the approval of similar application forms by the Division of Insurance.

## II. STATEMENT OF FACTS

### A. *GEICO v. Graham–Gonzalez*

The superior court in its order granting partial summary judgment to Graham–Gonzalez set forth the underlying facts as follows:

On June 20, 1996 Sandra Graham–Gonzalez was a passenger in a car driven by her sister, Christine Ivanoff. At the intersection of Abbott Road and Lake Otis Parkway, Ivanoff turned into the path of an oncoming van. As a result of the collision, Graham–Gonzalez sustained serious injuries. The car that Ivanoff was driving at the time of the accident was owned and insured by her mother, Judith Martin; GEICO insured the vehicle.

Graham–Gonzalez settled her liability claim for the policy limits, and then presented a claim for underinsured motorist benefits under the GEICO policy. GEICO thereafter tendered to Graham–Gonzalez what the insurer considered to be the full UIM policy limits, with interest and attorney's fees. GEICO agreed that by accepting the check, Graham–Gonzalez was not waiving her right to assert that the coverage was greater than the amount stated in Martin's insurance policy. Graham–Gonzalez then filed this lawsuit.

After reviewing the pleadings submitted by the parties, the court makes the following factual findings.

1. Judith Martin applied for an automobile liability insurance policy from GEICO Indemnity in February 1993. At that time GEICO recommended to Martin that she carry UIM coverage limits equal to the limits of her bodily injury liability coverage.

2. The Selection Form gave Martin the opportunity to reject UIM coverage, or to select from a range of coverage limits up to $1,000,000/$2,000,000.

3. At that time Martin selected UIM coverage equal to her bodily injury liability coverage, which was $50,000/$100,000.

4. During the time between July 1993 and January 1995, GEICO sent Martin a policy renewal package that included a Premium Statement, Declaration Pages, and Vehicle Page.

5. The information Martin received during this time showed that she was paying for certain coverages, including the UIM coverage.

6. During this time Martin consistently selected $50,000/$100,000 UIM coverage.

7. To save her money on premiums, Martin's coverage was changed to GEICO in March 1995; at that time she received a new policy number. The new number was 719–39–03.

8. In March 1995 Martin received a Selection Form that, like previous forms she had received, presented the option of selecting limits higher than $50,000/$100,000. The Selection Form was M–316 AK.

9. In April 1995 Martin received a packet from GEICO that set forth her coverage limits and the cost for each coverage; this included the price she would pay for her UIM insurance.

10. Between April 1995 and May 1996 Martin received information and renewal packets from GEICO. Martin was routinely informed that she had $50,000/$100,000 UIM coverage, and was informed of the cost of that coverage.

11. During the time that she was insured by GEICO, Martin did not make any changes to her UIM limits.

12. Policy number 719–39–03 was the policy in effect on the day of the accident involving Graham–Gonzalez.

13. Martin understood that if she selected higher limits for UIM coverage, she would have to pay more to GEICO.

14. None of the forms or papers GEICO provided to Martin prior to the acci-

dent contained the cost of the optional limits for UIM coverage.

15. None of the forms or papers GEICO provided to Martin prior to the accident advised Martin that the optional limits for UIM coverage could be obtained by paying relatively modest premium increases.

16. Neither Martin nor her insurance agent, Win Fowler, can recall discussing the cost of optional UIM coverage.

17. There is no evidence that Fowler or any other GEICO representative verbally furnished Martin the cost of the optional higher limits set forth in Form M–316 AK.

18. GEICO did not orally present to Martin the cost of the optional limits for UIM coverage prior to June 20, 1996.

19. The premium for automobile liability coverage is set based upon the insurance risk. As a consequence, insurance companies in Alaska cannot, and do not, establish a rate for all policyholders who want certain coverage. For example, a young driver with numerous speeding tickets and accidents would pay more for liability coverage than a fifty-year-old driver with a spotless record.

20. Unlike liability insurance, insurance companies can establish a premium for all policyholders who seeks [sic] the same UIM coverage.

21. GEICO now provides its policyholders in Alaska with a form that indicates the premium price for optional limits of UIM coverage.

22. The GEICO UIM coverage form that provides information concerning cost of coverage now states:

### Uninsured and Underinsured Motorist Bodily Injury Coverage

| Coverage Limit Per Person/Per Accident | Premium 1st Vehicle | Premium 2nd Vehicle |
|---|---|---|
| ( ) $50,000/$100,000 | $31.20 | $24.90 |
| ( ) $100,000/$200,000 | $40.20 | $32.20 |
| ( ) $100,000/$300,000 | $44.90 | $35.90 |
| ( ) $300,000/$300,000 | $55.80 | $44.60 |
| ( ) $250,000/$500,000 | $58.30 | $46.60 |
| ( ) $300,000/$500,000 | $59.20 | $47.40 |
| ( ) $500,000/$500,000 | $64.20 | $51.30 |
| ( ) $500,000/$750,000 | $67.60 | $54.10 |
| ( ) $500,000/$1 MIL | $72.30 | $57.80 |
| ( ) $1MIL/$1MIL | $83.80 | $67.00 |
| ( ) $1MIL/$2MIL | $91.70 | $75.70 |

☐ I *do not want* Uninsured and Underinsured Motorist Bodily Injury coverage for my vehicles. Rejection of this coverage *must* be in writing.

(Footnote omitted.)

### B. *State Farm v. Bozinoff*

Kenneth Bozinoff purchased automobile insurance from State Farm Mutual Automobile Insurance Company (State Farm) in August 1997. State Farm presented him with a UIM application form similar to that used by GEICO. The form listed the six optional levels of coverage required by AS 21.89.020(c). The form did not list the premium for each level of coverage. Kenneth Bozinoff checked the box opposite coverage limits of $100,000/$300,000.

Shortly before February 11, 1998, State Farm sent renewal forms to Kenneth Bozinoff. The renewal forms contained an insert that included a chart indicating the premiums for the various levels of UIM coverage. According to Kenneth Bozinoff, he did not receive the renewal information because it was sent to his tax adviser's address. Kenneth Bozinoff renewed his policy on February 11, 1998, for the same levels of coverage that he had purchased previously, $100,000/$300,000. On June 13, 1998, Kenneth Bozinoff's daughter, Maurita Bozinoff (Bozinoff),

was involved in a serious automobile accident in which the other driver, an underinsured motorist, was negligent. Bozinoff brought suit in superior court against State Farm for the maximum amount of UIM coverage mandated under AS 21.89.020(c), less what she had already received from the negligent driver.

## III. COURSE OF PROCEEDINGS

In *Graham–Gonzalez v. GEICO*, both parties moved for partial summary judgment on the issue of whether GEICO's procedures complied with AS 21.89.020(c). GEICO argued that the word "offer" in the statute meant "notify as to availability." Graham–Gonzalez argued that "offer" as used in the statute was a term of art and should be understood to mean what the word means when contract formation is described. She relied on *Spenard Plumbing & Heating Co. v. Wright*, in which we stated:

> Professor Corbin defines an offer as "an expression by one party of his assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express his assent to the identically same terms." The making of the offer, he points out, "creates a power of acceptance in the offeree," and once the offer has been made there is nothing left for the offeror to do but to wait for the offeree to close the contract.[1]

Using this approach Graham–Gonzalez argued that "offer" required communication of the price for each of the levels of coverage.

The superior court held that insurers are required to include the cost of coverage at each level in the initial application forms because "the offer must be presented in a manner reasonably calculated to permit the customer to make an informed decision of whether to purchase UIM coverage at the mandated levels...." The court ruled that the remedy for GEICO's noncompliance with the offer requirement was that the policyholder (Judith Martin) would have the opportunity to choose any level of mandated coverage and that the coverage so chosen would apply retroactively to the accident.

We granted GEICO's petition for review from these rulings.[2]

In *Bozinoff v. State Farm,* State Farm moved for summary judgment, seeking a declaration that it had complied with AS 21.89.020(c). Bozinoff opposed the motion. The superior court denied State Farm's motion for summary judgment, concluding that the initial application forms presented to Kenneth Bozinoff in August of 1997 did not comply with the statute. The court also ruled that the renewal forms that State Farm sent to Kenneth Bozinoff in 1998 did comply with the statute but that there was a question of fact as to whether Kenneth Bozinoff received these forms prior to the accident.

State Farm petitioned for review from these rulings. We granted its petition and consolidated its case with that of GEICO.

## IV. DISCUSSION

■ The dispute in these cases centers on the meaning of the requirement in AS 21.89.020(c) that an insurance company "shall ... offer" UIM coverage at various specified limits as part of an automobile liability insurance policy. We set out the full text of AS 21.89.020(c), and (e)—because it bears on the meaning of (c)—in the margin.[3]

1. 370 P.2d 519, 524–25 (Alaska 1962) (footnotes omitted).

2. We also granted Graham–Gonzalez's cross-petition for review from the court's rejection of her suggested remedy for violation of subsection .020(c). She contended that the highest statutorily mandated optional limits ($1,000,000/$2,000,000) should be automatically imposed. The cross-petition is mooted by our conclusion that subsection .020(c) was not violated.

3. AS 21.89.020(c) and (e) provide:

> (c) An insurance company offering automobile liability insurance in this state for bodily injury or death shall, initially and at each renewal, offer coverage prescribed in AS 28.20.440 and 28.20.445 or AS 28.22 for the protection of the persons insured under the policy who are legally entitled to recover damages for bodily injury or death from owners or operators of uninsured or underinsured motor vehicles. The limit written may not be less than the limit in AS 28.20.440 or AS 28.22.101. Coverage required to be offered under this section must include the following options:

The insurers argue that the statutory offer requirement has two components: (1) insurers must make the mandated coverage available; and (2) they must notify their prospective customers of its availability. The insureds argue that the statute also requires insurers to provide price information in their initial application forms.

 The question before the court is one of statutory interpretation. We have summarized the approach we take on questions of statutory interpretation as follows:

In construing the meaning of a statute, we look to the meaning of the language, the legislative history, and the purpose of the statute in question. "The goal of statutory construction is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others." "Because this is a case of first impression in this state, '[o]ur duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "

. . . .

We have rejected a mechanical application of the plain meaning rule in matters of statutory interpretation, and have adopted a sliding scale approach instead. The

plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.

In assessing statutory language, "unless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage." [4]

In our view the "shall offer" language of AS 21.89.020(c) requires that each insurer must make available to its prospective customers the mandated levels of UIM coverage. This means that insurers must notify prospective customers that they will sell such coverage. And since coverage would not truly be made available if an insurer refused to quote a price for it, the statute requires at least that prices be furnished upon request. But does the statute require that the initial form notifying customers of the availability of coverage include the price for each level? We conclude that it does not for the reasons that follow.

Alaska Statute 21.89.020(c) does not prescribe how insurers should notify their prospective customers of available coverage or direct any particular form for such notice. In *Peter v. Schumacher Enterprises, Inc.,* we

(1) policy limits equal to the limits voluntarily purchased to cover the liability of the person insured for bodily injury or death; . . .

(2) except when the coverage consists of motorcycle liability insurance, and except for a named insured required to file proof of financial responsibility under AS 28.20 or an applicant required to file proof of financial responsibility under AS 28.20, policy limits in the following amounts when these limits are greater than those offered under (1) of this subsection:

(A) $100,000 because of bodily injury to or death of one person in one accident, and, subject to the same limit for one person, $300,000 because of bodily injury to or death of two or more persons in one accident;

(B) $300,000 because of bodily injury to or death of one person in one accident, and, subject to the same limit for one person, $500,000 because of bodily injury to or death of two or more persons in one accident;

(C) $500,000 because of bodily injury to or death of one person in one accident, and, subject to the same limit for one person, $500,000 because of bodily injury to or death of two or more persons in one accident;

(D) $500,000 because of bodily injury to or death of one person in one accident, and, sub-

ject to the same limit for one person, $1,000,000 because of bodily injury to or death of two or more persons in one accident;

(E) $1,000,000 because of bodily injury to or death of one person in one accident, and, subject to the same limit for one person, $2,000,000 because of bodily injury to or death of two or more persons in one accident;

(3) other policy limits at the option of the insurer.

. . . .

(e) The coverage required under (c) and (d) of this section may be waived in writing by the insured in whole or in part. After selection of the limits by the insured or the exercise of the option to waive the coverage in whole or in part, the insurer is not required to notify any policy holder in any renewal, supplemental, or replacement policy, as to the availability of the coverage or optional limits, and the waived coverage may not be included in any renewal, supplemental, or replacement policy. The insured may, at any time, make a written request for additional coverage or coverage more extensive than that provided on a prior policy.

4. *Muller v. BP Exploration (Alaska) Inc.,* 923 P.2d 783, 787–88 (Alaska 1996) (citations omitted).

held that offers required to be made under .020(c) did not have to be in writing:

> Alaska Statute 21.89.020(c) clearly requires that policy purchasers be offered the sets of optional limits described in subsection .020(c)(2). But Peter contends that such offers must be in writing. Finding no textual basis for this argument, we reject it. But there is an unresolved factual question as to whether the availability of the optional limits prescribed by subsection .020(c) was communicated in any form to [the insured].[5]

Since the methods by which coverage is to be offered are not dictated by the statute—not even to the extent that offers must be in writing—it follows that the statute does not require that insurers quote premium prices when they first mention that multiple levels of coverage are available. Here, as in *Peter*, there is no textual basis for the argument that the statute imposes the particular formal requirement that the price be stated at the outset of the process leading to the sale.

The meaning of the verb "offer" in common usage in the context of the sale of a product is "to make available or accessible." [6] The general "to make available" usage was illustrated in *Peter*. With reference to the requirements of subsection .020(c), we noted that there were fact questions "as to whether the *availability* of the optional limits ... was communicated in any form...." [7] This usage does not connote that the price of the item made available for sale must necessarily be stated in the initial communication of the availability of the item. The media are replete with advertisements announcing the availability of goods and services that do not state prices.

Subsection (e) of .020 also indicates that "offer" in subsection (c) was meant to describe a process of making coverage available and giving notice of availability. The second sentence of (e) exempts insurers from the offer requirement of (c) on policy renewals once the insured has either waived UIM coverage altogether or selected a level of coverage. In the process it describes what (c) requires. The second sentence provides in relevant part: "After selection of the limits by the insured or the exercise of the option to waive the coverage ... the insurer is not required to *notify* any policyholder in any renewal ... policy, as to the *availability* of the coverage or optional limits...." (Emphasis added.) It follows from this language that *before* limits are selected or waived the insurer *is* required "to notify" customers "as to the availability of the coverage and optional limits." Thus it seems that in (e) the legislature described the acts that it contemplated insurers must fulfill under (c), when the exempting conditions of (e) are not present.

The legislative history of AS 21.89.020(c) also indicates that the legislature contemplated that "offer" would mean "make available and give notice of availability." Subsections (c) and (e) were enacted in 1984. Subsection (e) has remained unchanged. But subsection (c) originally only required that insurers "shall offer [UIM coverage] with limits equal [to the liability limits selected by the insured]." This was changed in 1990 when the requirement that at least six levels of UIM coverage be offered was added. According to the minutes of the House Labor and Commerce Committee, this was done to "ensure that members of the public would have the option to purchase at least one million dollars coverage of underinsured and uninsured motorist coverage." [8] During a committee meeting considering this amendment, an insurance company lobbyist suggested amending the "shall offer" language in .020(c) to "shall make available" in order to "alleviate vagueness as to when to make the offer." [9] Representative Donley, the prime sponsor of

---

5. 22 P.3d 481, 491 (Alaska 2001).

6. *See* Webster's Third New International Dictionary 1566 (1969). Following the quoted definition the dictionary states: "esp: to place (merchandise) on sale <~s a range of cameras at reasonable prices>".

7. *Peter*, 22 P.3d at 491 (emphasis added).

8. Minutes, House Judiciary Comm. Hearings on HB 429 (April 9, 1990) (testimony of Stan Darlington).

9. Minutes, House Labor and Comm. Hearings on HB 429 (February 6, 1990) (testimony of Jay Frank).

the bill, rejected this suggested change. According to the minutes:

> Chairman Donley told Mr. Frank that regarding his recommendation to change "shall offer" to "shall make available," the wording "shall offer" compels the insurer to offer the insurance to the insured whereas if the insurer only has to "make it available" it may not get mentioned. Rep. Gruenberg concurred.[10]

Thus Representative Donley recognized that the offer requirement had two components: the coverage had to be made available and it had to be "mentioned." This is what subsection (e) implies that the offer requirement in subsection (c) means. To change "offer" in (c) to "make available" would potentially eliminate the notice component described in (e). This history therefore supports the view that the legislature intended that the offer language of subsection (c) would mean what subsection (e) implies that it means. Insurers must not only make each level of mandated coverage available, they must also notify insureds as to the availability of each level of coverage. But absent from the legislative history is any suggestion that the legislature intended that the premium for each optional level of coverage would have to be quoted as part of the offer.

Although AS 21.89.020(c) does not purport to regulate the forms insurers may use in soliciting coverage, such forms are subject to state regulation. Alaska Statute 21.42.120(a) requires that application forms that are to become part of a policy must be filed with and approved by the director of the Division of Insurance. Alaska Statute 21.42.130(1) requires that the director disapprove a form that is filed that is "in any respect in violation of or does not comply with [Title 21 of the Alaska Statutes]." At the request of GEICO we have taken judicial notice that the Division of Insurance has approved application forms submitted by insurers and by agencies serving insurers that, like the applications at issue in this case, list the various levels of coverage required but do not state the premium that will be charged for each level of coverage.[11]

The parties differ as to the weight that this court should give to the division's approvals. GEICO argues that we should give substantial deference to the approvals since the legislature has delegated to the division the duty of enforcing and administering the statutes concerning insurance. Graham–Gonzalez, on the other hand, argues that the approvals have no legal effect and that the court must exercise its independent judgment to decide what AS 21.89.020(c) requires.

■ Typically we use the independent judgment standard on questions of law unless the "issue involves agency expertise or the determination of fundamental policy questions on subjects committed to the agency."[12] This court has not ruled on whether Division of Insurance approvals of forms under AS 21.42.120 and .130 should be reviewed deferentially under the reasonable basis standard or whether the court should substitute its judgment for that of the division on the question whether forms comply with the applicable statute. At least one other jurisdiction has suggested that the more deferential standard is appropriate.[13] If we were to adopt the more deferential standard, the question presented in this case would be readily resolved in favor of the insurers, for it is plainly reasonable to interpret the statute as not requiring that initial application forms contain premium information. But even if the independent judgment standard were applied, the division's approval of forms like those used in the present case would be entitled to some deference. In such cases this court gives "some weight to what the agency has done, especially where the agency interpretation is longstanding."[14] In the

---

10. *Id.*

11. The approvals were issued in 2002. GEICO also submitted similar forms that were approved by the Division of Insurance for Progressive Insurance Company in 1995, 1999, and 2002.

12. *DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 277 (Alaska 2003). *See also Lakosh v. Alaska Dep't of*

*Envtl. Conservation*, 49 P.3d 1111, 1114 (Alaska 2002).

13. *See McTaggart v. Liberty Mut. Ins.*, 267 Kan. 641, 983 P.2d 853, 857–58 (1999).

14. *Diaz v. Silver Bay Logging, Inc.*, 55 P.3d 732, 741 (Alaska 2002) (quoting *Fairbanks N. Star*

present case it is unnecessary to determine which standard of review should be applied because even if only some weight is given to the approvals they are consistent with this court's view as to what .020(c) requires.

The purpose of .020(c) is to give insureds various options with respect to UIM coverage: to select coverage with limits mirroring their liability limits, or with different limits, or to waive coverage altogether. This purpose is not frustrated by interpreting the subsection as not requiring premium quotes to be included in application forms. Insureds can be expected to ask for the prices of coverage they are interested in.

Application forms would be more informative if they contained premium information, and this is a factor that favors the respondents' position in these cases. But it is the only factor. It is outweighed, in our judgment, by the reasons pointing to the opposite conclusion outlined above. To summarize, these are (1) that .020(c) does not impose formal requirements as to the content of application forms and, as we have previously held, does not require that the notification of levels of coverage be in writing; (2) the common, nontechnical, meaning of the word "offer" in a sales context is, in short, "to make available," a definition that does not require that the price of the item to be sold be communicated in the initial solicitation; (3) subsection .020(e) describes what is meant by the offer requirement in subsection (c)

consistent with the common meaning—coverage must be made available and notice of its availability must be given; (4) the legislative history indicates that the intended meaning of "offer" is the meaning reflected in subsection (e) requiring both availability and notice of availability of required levels of coverage; and (5) the Division of Insurance in the exercise of its delegated authority to regulate insurance company forms has with apparent consistency approved of forms that do not set out the premiums for the mandated levels of UIM coverage.

For these reasons we conclude that AS 21.89.020(c) does not require that application forms state the premiums that would be charged for each level of UIM coverage mandated by that subsection.[15] We thus REVERSE the decisions of the superior court in these cases and REMAND for further proceedings consistent with this opinion.

FABE, Justice, with whom BRYNER, Chief Justice, joins, dissenting.

FABE, Justice, with whom BRYNER, Chief Justice, joins, dissenting.

I disagree with the court's decision because I believe that AS 21.89.020(c) requires insurers to inform customers about both the availability and the relatively moderate pricing of UIM coverage. Informing policyholders that additional UIM coverage is available for only a small additional charge will prompt

---

*Borough Sch. Dist. v. NEA–Alaska. Inc.*, 817 P.2d 923, 925 (Alaska 1991)).

**15.** The question presented is one that has received considerable attention, both in Alaska and in other jurisdictions. In addition to superior court rulings in the cases now before us, another Alaska superior court judge has ruled that the use of a selection form similar to that used by GEICO and State Farm constituted a proper offer as required by AS 21.89.020(c). *Moore v. Progressive Specialty Ins. Co.*, No. 3AN–99–11321 Ci. (Alaska Super., March 4, 2002). The United States District Court for the District of Alaska has ruled that "nothing in the statutory language" nor in "Alaska case law require[s] that an insurer state the corresponding premiums to fulfill its obligation to 'offer' UIM coverage." *Cruz v. Progressive Northwestern Ins. Co.*, No. A–01–40 Cv. (U.S.Dist.Ct., May 16, 2002).

In other jurisdictions there are similar differences of opinion. The lead case for inclusion of premium information is *Hastings v. United Pacif-*

*ic Ins. Co.*, 318 N.W.2d 849, 853 (Minn.1982) (in order to comply with statutory offer requirement the insurer must communicate to the insured that optional coverages are available for a relatively modest increase in premiums). Notwithstanding that the Minnesota legislature repealed Minn.Stat. § 65B.49, subd. 6(e), upon which *Hastings* relies, some other jurisdictions have followed *Hastings*. *See Mollena v. Fireman's Fund Ins. Co. of Hawaii, Inc.*, 72 Haw. 314, 816 P.2d 968, 971–72 (1991); *Linko v. Indemn. Ins. Co. of N. Am.*, 90 Ohio St.3d 445, 739 N.E.2d 338, 342 (Ohio 2000); *State Farm Mut. Auto. Ins. Co. v. Wannamaker*, 291 S.C. 518, 354 S.E.2d 555, 556–57 (1987). Other jurisdictions have ruled that premium information need not be stated. *See Tallent v. Nat'l Gen. Ins. Co.*, 185 Ariz. 266, 915 P.2d 665, 667 (1996); *Libby v. Gov't Employees Ins. Co.*, 79 Md.App. 717, 558 A.2d 1236, 1240 (1989); and *Beck v. Powell*, 113 Or.App. 318, 832 P.2d 1254, 1257 (1992).

some consumers who might not otherwise ask to seek specific information about the cost of UIM insurance, thus helping them to make informed decisions about their desired level of coverage. This approach does not require insurance companies to list specific prices for UIM coverage and therefore comports with our holding in *Peter v. Schumacher Enterprises, Inc.* that UIM insurance offers need not be in writing .[1]

## I. What Constitutes a Meaningful "Offer" Under AS 21.89.020(c)?

The majority of jurisdictions that have considered comparable statutes have concluded that insurance companies are required to mention pricing when offering UIM coverage.[2] In the first of these decisions, the Minnesota Supreme Court held in a case similar to this one that insurance companies must notify policyholders that optional UIM coverage is available for "only a small additional charge."[3] A number of other jurisdictions followed suit.[4] This trend is grounded in the conclusion of a number of courts that statutory language mandating an "offer" requires insurance companies to make "meaningful" offers so that consumers can make informed choices about their preferred level of coverage.[5]

The approach of the majority of the states that have examined this question—requiring some discussion of the cost of UIM coverage as part of a mandatory offer—comports with

the Alaska Legislature's purpose in enacting AS 21.89.020(c). The provision reflects a broader effort on the part of the legislature to ensure that victims of automobile accidents are compensated for their injuries. In *Peter*, we observed that "[t]he legislature has concerned itself since 1984 with making UM/UIM coverages available to the public,"[6] and looked to the legislature's preamble to the Motor Vehicle Safety Responsibility Act, which states:

> The legislature is concerned over the rising toll of motor vehicle accidents and the suffering and loss inflicted by them. The legislature determines that it is a matter of grave concern that motorists be financially responsible for their negligent acts so that innocent victims of motor vehicle accidents may be recompensed for the injury and financial loss inflicted upon them.[7]

In light of this statement of purpose, and other provisions in the Alaska Statutes mandating that drivers possess motor vehicle liability insurance,[8] AS 21.89.020(c) reflects an intent on the part of the legislature to facilitate the purchase of UIM coverage by policyholders. To this end, the legislature required that insurance companies "offer" UIM coverage. To be meaningful, the offer must be sufficiently detailed to allow policyholders to make informed decisions about their desired level of coverage.

Alaska Statute 21.89.020(e), which requires a written waiver of UIM insurance, illus-

1. 22 P.3d 481, 491 (Alaska 2001).

2. *See Mollena v. Fireman's Fund Ins. Co. of Haw., Inc.,* 72 Haw. 314, 816 P.2d 968, 972 (1991) (applying the four-part test from *Hastings,* below); *Cloninger v. Nat'l Gen. Ins. Co.,* 109 Ill.2d 419, 94 Ill.Dec. 549, 488 N.E.2d 548, 551 (1985) (same), *superseded by statute, see DeGrand v. Motors Ins. Corp.,* 146 Ill.2d 521, 167 Ill.Dec. 944, 588 N.E.2d 1074, 1077 (1992); *Hastings v. United Pac. Ins. Co.,* 318 N.W.2d 849, 853 (Minn. 1982) (construing a statute that was repealed in 1980 and requiring that the "offer" (1) be commercially reasonable, (2) specify the limits of optional coverages, (3) apprise the insured of the nature of the optional coverage, and (4) notify the insured that optional UIM coverage is available for "only a small additional charge"); *Linko v. Indem. Ins. Co. of N. Am.,* 90 Ohio St.3d 445, 739 N.E.2d 338, 342 (Ohio 2000); *State Farm Mut. Auto. Ins. Co. v. Wannamaker,* 291 S.C. 518, 354 S.E.2d 555, 556 (1987) (adopting the four-

part test from *Hastings* ); *but see Tallent v. Nat. Gen. Ins. Co.,* 185 Ariz. 266, 915 P.2d 665, 667 (1996); *Libby v. Gov't Employees Ins. Co.,* 79 Md.App. 717, 558 A.2d 1236, 1240 (1989); *Beck v. Powell,* 113 Or.App. 318, 832 P.2d 1254, 1257 (1992).

3. *Hastings,* 318 N.W.2d at 853.

4. *See* cases cited *supra* note 2.

5. *See Hastings,* 318 N.W.2d at 852; *Kuchenmeister v. Ill. Farmers Ins. Co.,* 310 N.W.2d 86, 88 (Minn.1981); *Linko,* 739 N.E.2d at 342; *Wannamaker,* 354 S.E.2d at 557.

6. 22 P.3d at 489.

7. *Id.* (quoting AS 28.20.010).

8. AS 28.22.011.

trates that the legislature intended to do more than merely require insurers to inform consumers that optional UIM coverage existed. The written-waiver language indicates that the legislature recognized that most *informed* consumers would want UIM coverage; for this reason, the legislature decided to treat all consumers as though they did want the coverage unless insurers took the affirmative step of avoiding the possibility of an *uninformed* waiver by securing an express waiver in writing. As Judge Sanders reasoned in *Graham–Gonzalez v. GEICO*, the offer of UIM coverage "must be presented in a manner reasonably calculated to permit the customer to make an informed decision of whether to purchase [the additional] coverage at the mandated levels, and this includes the cost of the coverage." [9]

The court relies in part on minutes from a 1990 committee meeting where legislators rejected a proposal to change the language in AS 21.89.020(c) mandating that insurance companies "shall offer" UIM coverage to "shall make available." The court concludes that the decision to keep the "shall offer" language indicates that the legislature intended to require companies to notify insured parties about the availability of the coverage, but not to inform them about the price. I find Judge Sanders's interpretation of this legislative history in *Graham–Gonzalez*[10] to be more persuasive. Judge Sanders astutely observed that litigation in other states formed the backdrop to the Alaska Legislature's decision to keep the "shall offer" language in the statute. In the years preceding the Alaska Legislature's decision, courts in other states examined the meaning of "shall offer" in comparable statutes. Several states concluded that "shall offer" indicated an obligation on the part of insurers to include pricing options as part of the offer.[11] As Judge Sanders concluded, it is likely that the Alaska Legislature was aware of these decisions when it decided to retain the "shall offer" language in the statute.

Because Judge Sanders was correct in his conclusion that the offer of UM/UIM coverage in *Graham–Gonzalez* was defective, this aspect of his decision should be affirmed. But because State Farm's notice in *Bozinoff* informed Bozinoff that UIM coverage was "available for a relatively modest increase in premium," its offer was adequate.

## II. What Is the Appropriate Remedy?

The court does not reach the question of how to remedy an inadequate offer under AS 21.89.020(c) because the court does not find the offers in these cases inadequate. Because I believe that the offer in *Graham–Gonzalez* was inadequate, I would adopt a two-part remedy granting Graham–Gonzalez the level of coverage that Martin would have purchased had she received a proper offer under AS 21.89.020(c). First, upon a finding that an insurer failed to offer UIM coverage under AS 21.89.020(c), the policy would automatically be imputed with UIM coverage limits equal to the liability limits purchased. Next, the court would engage in a fact-finding inquiry to determine whether the policyholder would have purchased "optional" additional coverage above the policy's limits had the additional coverage been offered.

This remedy requires a two-fold reading of AS 21.89.020(c). Under AS 21.89.020(c)(1), insurance companies must offer UIM coverage with policy limits equal to the limits voluntarily purchased under the insured's liability coverage. Under AS 21.89.020(c)(2), insurance companies must offer additional optional UIM coverage with policy limits higher than what the insured party carries in liability insurance. This reading of the statute is consistent with our decision in *Peter*, where we stated that "Alaska Statute 21.89.020(c) requires insurance companies to offer in automobile liability policies UM/UIM coverage with minimum limits of $50,000 per person and $100,000 per accident. In addition, subsection (c)(2) requires that optional higher limits be offered up to $1,000,000/

---

9. Order Granting Partial Summary Judgment, Case No. 3AN–00–12188 CI (Alaska Super., Aug. 8, 2002).

10. *Id.*

11. *See Cloninger*, 94 Ill.Dec. 549, 488 N.E.2d at 551; *Hastings*, 318 N.W.2d at 853; *Wannamaker*, 354 S.E.2d at 556.

$2,000,000." [12] Thus, the two-part remedy affords the policyholder the UIM baseline coverage that would likely have been purchased if offered under AS 21.89.020(c)(1), with a possibility of receiving the "optional" additional coverage that might have been purchased if it had been offered under AS 21.89.020(c)(2).

Although I recognize Judge Sanders's concerns that such a remedy might invite self-serving testimony on the part of insured parties, we were fully aware in *Peter* that "[w]hat [a policyholder] would have done if higher limits had been offered is a speculative subject. But it is a subject on which personal and self-interested testimony is both admissible and necessary to show a loss." [13] Moreover, some of the problems created by such an inquiry can be alleviated by placing part of the burden on the violating insurance company. If the policyholder testifies that he or she would have purchased a policy with a higher level of coverage than the liability coverage, I would shift the burden to the insurer to prove that the policyholder would not have purchased the higher amount. While the solution is not perfect, I believe that it is the best available remedy. [14]

Because I believe that a meaningful offer under AS 21.89.020(c) must include some information about the price of UIM coverage, I respectfully dissent.

---

12. 22 P.3d at 484.

13. *Id.* at 491.

14. Some courts have employed a remedy that provides the policyholder with coverage equal to the insured's liability policy or the statutory minimum. *See, e.g., Mollena,* 816 P.2d at 974. I believe this remedy could shortchange some consumers who would have purchased additional UIM coverage. On the other hand, a remedy that automatically grants policyholders the maximum coverage amount or that treats the offer as left open would present some policyholders with a windfall they would not otherwise have acquired.